IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
FEBRUARY 17, 2009 Session

## IN RE: J. G. H., JR., DOB 11/04/05, A Child Under 18 Years of Age
## JAMES and TERI WOLFE v. JENNIFER LYNN DUCKHORN

Direct Appeal from the Juvenile Court for Shelby County
No. S3119      Herbert Lane, Special Judge

———

No. W2008-01913-COA-R3-PT - Filed August 17, 2009

———

This appeal involves the termination of a mother's parental rights to her son based on the ground of abandonment by willful failure to visit. Mother appeals, claiming that the trial court should have dismissed the termination petition because the petitioners lacked standing, or alternatively, because the petition failed to contain a notice provision required by Tennessee Rule of Civil Procedure 9A. Mother also claims that the trial court looked to the wrong four-month period when determining whether she failed to visit and erred in finding that her failure to visit was willful. She also claims that termination was not in her son's best interest. Finally, Mother claims that her due process rights were violated in various ways. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., joined and J. STEVEN STAFFORD, J., dissented.

W. Ray Glasgow, Memphis, TN, for Appellant

Margaret A. Reid, Memphis, TN, for Appellees

# OPINION

## I. FACTS & PROCEDURAL HISTORY

Jennifer Duckhorn ("Mother") gave birth to a child ("Son") out of wedlock on November 4, 2005. On May 17, 2006, when Son was six months old, the Department of Children's Services ("DCS") was contacted regarding allegations of a "Drug Exposed Child and Substantial Risk of Physical Injury," following an incident involving Son, Mother, and Son's father at a doctor's office. When a DCS case manager arrived at the doctor's office, Mother and Son's father were already being detained in separate police cars. Police officers informed the case manager that Mother and Son's father were being arrested for domestic violence, and that Mother had failed a Breathalyzer test. The case manager was informed by two physicians that Mother and Son's father both appeared to be "drugged" and had "passed out" in the waiting room. The physicians reported that "it took a great deal to wake them up," and when the parents were asked about Son's whereabouts, they did not know where he was. Apparently, the police had already transported Son to the Shelby County Juvenile Court. According to the physicians, Son's parents admitted to using drugs and having a "threesome" the night before. The physicians stated that Mother appeared to have been beaten. The case manager spoke with Mother, who admitted to drinking one beer and using marijuana. Mother gave the case manager a telephone number to contact her father and step-mother and stated that Son would be safe with them.

The case manager contacted Mother's step-mother ("Grandmother"), who stated that she would be willing to keep Son as long as necessary. The case manager then spoke with Mother's father ("Grandfather"), who, according to the case manager's notes, stated that he was aware of Mother and Son's father using drugs and possibly selling drugs out of their home. Grandfather expressed concerns about Son's well-being and also agreed to care for Son as long as possible. The case manager visited Grandparents' home and determined that it was an appropriate placement for Son. According to the case manager's notes, Grandmother stated during the visit that Mother was "using illegal and prescription drugs in abundance."

On May 19, 2006, DCS filed a "Petition to Adjudicate Dependency and Neglect," alleging that Son was dependent and neglected within the meaning of Tennessee Code Annotated section 37-1-102(b)(12)(F).[1] The petition recited the facts and allegations surrounding the incident at the doctor's office and sought a protective custody order placing temporary custody of Son with Grandparents. That same day, the juvenile court special judge signed a protective custody order awarding temporary custody of Son to Grandparents. A guardian ad litem was appointed on August 30, 2006. Following a hearing on October 20, 2006, the court appointed an attorney for Mother, ordered Mother to submit to a drug screen, and continued the matter until January 19, 2007.

---

[1] Tennessee Code Annotated section 37-1-102(b)(12)(F) provides that a child "[w]ho is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others" is a "[d]ependent and neglected child."

Son turned one year old on November 4, 2006. At some point, Mother moved in with Grandparents and Son. However, following an argument between Mother and Grandmother, Mother was "asked to leave" Grandparents' home, and she moved in with her boyfriend and his parents. Son continued to live with Grandparents. According to DCS records, when the case manager called Grandfather on January 17, 2007, to remind him of the upcoming hearing, Grandfather informed the case manager that Mother was "on drugs and her whereabouts [were] unknown," and he stated that he and Grandmother wanted "full and permanent custody" of Son.

The January 19 hearing was continued to March 23 in order to allow Mother's attorney to be present. On the morning of January 29, 2007, Mother arrived at a local DCS office with Son. According to DCS records prepared that day, Mother reported that Grandmother had given Son back to her, stating that she did not want to get into a custody battle with Mother and that Mother had "cursed her out one too many times." A "Child and Family Team Meeting" was held that morning, with Mother, her boyfriend, and various DCS personnel present, and Grandmother and the guardian ad litem participating by telephone. Grandmother explained that she allowed Mother to have an overnight visit with Son while Grandparents went out of town, and a dispute arose when Mother called and insisted that they return early so that she could return Son to them early. Grandmother said that she wanted to adopt Son, but that Mother was "on her way to getting custody back." Grandmother reportedly stated that she decided to "get out of the situation" because she did not want to be in a custody battle with Mother. According to DCS records, Grandmother stated that she was not willing to keep Son any longer due to her frustration with Mother, and she said that no one else was willing to take Son either. Mother informed the case manager that she could not take care of Son because she was too busy and was "attempting to get her life together." Mother explained that she was working two jobs and wanted to go back to school, and that she had nowhere to live with Son. Apparently, Mother's boyfriend's parents would not allow Son to stay there with Mother. Mother admitted to using marijuana and cocaine in the past but said that she had not used drugs in "a long time." The DCS representatives discussed the option of foster care with Mother, and Mother agreed with the idea of placing Son into DCS custody. The case manager's records state that placing Son in DCS custody was deemed necessary "due to [Son] being abandoned by [Mother] and [Grandmother]."

A different case manager, Ms. Chantay Harris, was then assigned to Son's case. Ms. Harris also contacted Grandmother and, according to her records, Grandmother offered to discuss Son's daily schedule with his new foster parent but again stated that she and Grandfather no longer wanted to maintain custody of Son due to their recent confrontation with Mother.[2]

---

[2] At trial, Grandmother claimed that there was a misunderstanding between her and DCS regarding whether she wanted to maintain custody of Son. She explained that when DCS called her, "they caught me at a really bad time" and "I was still very upset when I got on the phone, and [they] asked me if I would take my grandson back, and I said, 'I will not help [Mother] again.'" Grandmother said she then asked, "Can I please get off the phone?" However, she claimed that she never explicitly told anyone at DCS that she would not take Son back, and she said she hoped that DCS would simply call Grandfather and discuss the situation with him. Despite Grandmother's testimony, the trial court found that Grandmother "clearly told [DCS] that she no longer wanted [Son] in her home." Grandfather testified that he

(continued...)

Apparently, DCS then filed a "Petition to Modify," again alleging that Son was dependent and neglected.[3] The petition alleged that Grandparents wanted to relinquish custody of Son, that Mother was currently homeless and unable to properly care for Son, and that custody should be awarded to DCS. A second protective custody order was entered by the juvenile court on January 29, 2007, placing temporary custody of Son with DCS. The order stated that Son was currently at the local DCS office with no relatives willing to take care of him. Son was placed in a foster home later that day.

On February 8, 2007, another "Child and Family Team Meeting" was held and attended by Mother, her boyfriend, Grandparents, Son's new foster parents, Ms. Harris (the new DCS Case Manager), and various other DCS representatives. Son's father was contacted prior to the meeting, and he stated that he wanted Son to be adopted because he could not care for him. A permanency plan was developed with the stated goal of reunifying Son with Mother within one year. Mother had various responsibilities pursuant to the permanency plan, such as obtaining stable housing and employment,[4] completing a drug assessment, and scheduling supervised visits with Son. Specifically, she was required to contact DCS "to schedule family visits with a minimum of four hours per month." Ms. Harris explained to Mother the criteria and procedures for terminating parental rights, and Mother signed an acknowledgment stating that she had received a copy of such procedures.

On February 21, 2007, Ms. Harris went to visit Son at his foster home, and the foster mother reported that Mother had not contacted her since the February 8 meeting. Subsequently, a visit was scheduled with Mother for February 26, 2007, for one hour. Mother arrived at the visit as scheduled, and Son's foster mother, who supervised the visit, reported that it "went really well."

On March 2, 2007, Ms. Harris again visited Son at his foster home. The foster mother reported that Mother had not called about visitation, but she said that Grandmother had called to inquire about scheduling weekend visitation for Son with Grandparents. Ms. Harris contacted Grandmother, who stated that Grandparents had not spoken with Mother and did not want to have contact with her until she "[got] herself together."

---

[2](...continued)
contacted DCS about getting Son back during the afternoon of January 29, between 12:00 and 1:00 p.m., but that he was told that Son had already been placed in a foster home. Grandmother said she did not tell anyone at DCS that she wanted Son back until February 8. Grandparents were informed that they could not regain custody of Son at that time due to the allegations that Grandmother had abandoned Son.

[3] We use the word "apparently" because the final page or pages of this petition were omitted from the record. However, it appears that the petition was in fact filed because the juvenile court's protective custody order quotes portions of the petition verbatim.

[4] Although Mother had stated on January 29 that she was working two jobs, she stated at the February 8 meeting that she was unemployed.

On March 5, 2007, Ms. Harris called Mother about scheduling another supervised visit, and Mother agreed to visit Son on the following Friday, March 16, 2007. However, when Ms. Harris called Mother a few days later to confirm the visit, Mother stated that she wanted to cancel the visit because she would be returning that day from a trip with her boyfriend. Mother asked Ms. Harris about scheduling a visit on Saturday, and Ms. Harris informed her that although she could not supervise visits on Saturdays, Mother could ask Son's foster mother about supervising on Saturdays. Ms. Harris informed Mother that foster parents were not obligated to supervise visits on the weekends. Mother stated that she would call the foster mother to schedule a visit when she returned from the trip with her boyfriend.

On March 23, 2007, a hearing was held in juvenile court on the petition to adjudicate Son dependent and neglected. Mother did not attend the hearing. Her appointed attorney informed the court that he had spoken with Mother, and that she was unable to attend the hearing because she was attending bartending school. He said that Mother "knows what's going on. And she waives her appearance to show up."[5] Following the hearing, the court entered an order finding Son dependent and neglected within the meaning of Tennessee Code Annotated section 37-1-102(b)(12)(F) and finding that it was in Son's best interest to be placed in DCS custody. The order states that temporary custody had previously been awarded to Grandparents, but that they no longer wanted custody of Son, and that Mother had admitted to using drugs and remained unstable.[6]

On March 30, 2007, Son's foster mother again informed Ms. Harris that she had not received any contact from Mother regarding visitation. Ms. Harris attempted to contact Mother several times in April and would either leave a message with Mother's boyfriend or on Mother's voicemail. However, Mother did not return her calls. Ms. Harris also sent Mother a certified letter informing her that a foster care review meeting would be held on April 24, 2007, in order to determine whether the need for Son's foster care continued and when he could possibly be removed from foster care. The letter encouraged Mother to submit a written statement to the review panel in the event that she could not attend in person.

On April 17, 2007, Grandfather contacted Ms. Harris and informed her that friends of the family, James and Teri Wolfe, were interested in adopting Son. He explained that Son had spent some weekends with the Wolfes when Grandparents had custody of Son. Ms. Harris informed Grandfather that Mother's parental rights would have to be terminated before the Wolfes could adopt Son. Grandfather transferred the telephone call to Mr. Wolfe, who was Grandfather's business partner, so that he could discuss the situation with Ms. Harris as well. Mr. Wolfe confirmed to Ms. Harris that he and his wife were interested in adopting Son. Ms. Harris subsequently requested that a background check and home study be completed on Mr. and Mrs. Wolfe.

---

[5] Mother claims that her appointed attorney "misrepresented her interests" by making this statement.

[6] The transcript of the hearing indicates that the guardian ad litem was relieved of her appointment, and that the referee intended to appoint another guardian ad litem in the future, but the court's order does not address this issue.

The foster care review meeting was held on April 24, 2007, and the Foster Care Advisory Review Board recommended that Son remain in foster care. The meeting was attended only by Grandfather. Mother did not attend the meeting or submit a written statement.

On May 3, 2007, Son's foster mother again informed Ms. Harris that Mother had made no attempts to schedule visitation with Son. That same day, Ms. Harris made an unannounced visit to Mother's boyfriend's parents' residence to speak with Mother. Ms. Harris asked Mother why she had not returned her telephone calls, and Mother said she did not know that Ms. Harris had called. Mother acknowledged receiving the letter about the foster care review meeting and said that she was unable to attend because she was at bartending school. Mother stated that her appointed attorney had informed her that she did not have to attend the foster care review meeting or the previous court hearing because of her bartending school schedule.[7] When Ms. Harris asked Mother about visiting with Son, Mother stated that she did not want to visit with him because she "[did] not want it to be hard for him if something happen[ed]." Ms. Harris told Mother that it was important for her to continue visiting with Son so that a relationship could be established, but Mother responded by stating that they would always have a bond. Following further discussion, Mother agreed to contact Ms. Harris the next day to schedule a visit with Son.

In May of 2007, the Wolfes began visiting with Son on a regular basis. Another "Child and Family Team Meeting" was held on May 18, 2007, which was attended by Grandfather, the Wolfes, and various DCS personnel. According to Ms. Harris, Mother received notice of the meeting via mail and telephone, but she did not attend the meeting. The permanency plan's former goal of reunifying Son with Mother was changed to "Planned Permanent Living Arrangement with Non-Relative(s)." The revised permanency plan noted that the home study request, background check, and other matters still needed to be completed before Son could be placed with the Wolfes. Mother and Grandparents were to continue supervised visitation with Son.[8]

On May 21, 2007, Mother contacted DCS and said that she wanted to visit with Son. Ms. Harris suggested scheduling a visit for the following week, but Mother stated that she would have to wait and check her bartending school schedule. Ms. Harris called Mother a few days later and scheduled a visit for May 29, 2007. Ms. Harris asked Mother why she did not attend the previous Child and Family Team Meeting, and Mother said that she was at bartending school. Ms. Harris explained the goal change that occurred at the meeting, and Mother stated that she was in agreement with the goal change. For some reason not apparent from the record, there was an attempt to reschedule the May 29 visit to May 31. However, the foster mother had a conflict and was unable to have Son at the May 31 visit. Ms. Harris made several attempts to contact Mother to inform her that the visit could not be rescheduled as planned, but her telephone number had been disconnected.

---

[7] Mother testified at trial that she attended bartending school from 9:00 a.m. until around 2:00 or 3:00 p.m., and that the school was one hour from her home.

[8] It is not clear from the record whether this permanency plan was ratified, as the copy included in the record was not signed by the judge.

Therefore, Ms. Harris went to the designated meeting location in order to inform Mother of the cancellation. Mother arrived on time for the visit and was informed by Ms. Harris that Son would not be there. Ms. Harris suggested rescheduling the visit for the following week, but Mother said she could not visit the next week because she had to work at a golf tournament. Mother and Ms. Harris then proceeded to discuss the recent goal change, and Mother again stated that she agreed with the change and wanted stability for Son.

On May 30, 2007, DCS received a completed report from CASA approving the Wolfes for Son's placement. Son had three visits with the Wolfes in June of 2007. A visit was scheduled with Mother for June 14, but she called to cancel the visit that morning, stating that she had to work. On June 14, 2007, DCS filed a petition to modify in the juvenile court, requesting that the court remove custody of Son from DCS and award custody to the Wolfes.

On June 25, 2007, Mother attended her second supervised visit with Son, which lasted approximately one hour. She had not visited with Son since February 26, 2007, at the first supervised visit. According to Ms. Harris, Son appeared to be very happy to see Mother and recognized her although it had been several months since he had seen her. During the visit, Mother told Ms. Harris that she was still in agreement with Son being placed in the Wolfes' custody.

On June 26, 2007, DCS held a "Discharge Planning Child and Family Team Meeting" to discuss Son being removed from DCS custody. This meeting was attended by Mother, Grandparents, the Wolfes, and various DCS personnel. All parties present at the meeting agreed with the plan to remove Son from DCS custody and place him in the custody of the Wolfes.

A hearing was held in juvenile court on July 5, 2007, regarding Son's removal from DCS custody. Mother attended the hearing, as did Grandparents, the Wolfes, Son's current foster mother, and DCS staff. The Wolfes also brought Son to the hearing. The attorney for DCS informed the court that all the parties agreed with the idea of placing custody with the Wolfes, and when the court asked Mother about her position, Mother confirmed that she thought it was a "good plan." The court discussed the issue of Mother having supervised visitation with Son at the Exchange Club and orally instructed both parties to go register at the Exchange Club for such visitation. The court subsequently entered an order removing Son from DCS custody, placing custody and guardianship with the Wolfes, and providing for Mother to have visitation privileges at the Exchange Club.

After the Wolfes obtained custody of Son, they took Mother to dinner to discuss the steps that needed to be taken in order for them to be allowed to adopt Son. Mother expressed her agreement with the Wolfes' plan to adopt Son. On July 31, 2007, the Wolfes filed a "Petition for Termination of Parental Rights," alleging that Son's father had abandoned Son by willfully failing to visit and/or support him and that Mother wished to voluntarily surrender her parental rights to Son. The Wolfes alleged that it was in Son's best interest for both parents' rights to be terminated and custody to be placed with the Wolfes with the right to proceed with adoption.

Around September of 2007, the Wolfes took Son to the fair, and coincidentally saw Mother there working at a concession stand. The Wolfes and Son visited with Mother at the fair for about thirty minutes.

A surrender hearing was scheduled for September 12, 2007. The Wolfes and Mother appeared, and Mother filled out the "Forms for Surrender of Child in Tennessee Directly to Adoptive Parents by a Parent or Guardian." However, the referee did not sign the surrender forms because he instructed the parties to obtain an adoptive home study on the Wolfes. The hearing was then rescheduled for October 10, 2007, but Mother failed to appear at the October 10 hearing. The hearing was then continued until November 29, 2007. Mr. Wolfe attempted to contact Mother numerous times about the hearings, but Mother did not return his telephone calls.

Son turned two years old on November 5, 2007. On November 6, 2007, the Wolfes filed an amended petition in juvenile court, seeking to terminate Mother's parental rights on the ground of abandonment by willful failure to visit and/or support Son. The petition stated that Mother had previously expressed her desire to voluntarily surrender her parental rights, but that she had failed to appear at the voluntary surrender proceedings. The Wolfes also asserted that it was their earnest desire to adopt Son, and that they intended to proceed with adoption if Son's parents' rights were terminated.

At the November 28, 2007 hearing, Mother appeared and requested that a new attorney be appointed for her. Apparently, she had not been in contact with her previously appointed attorney for several months. Mother also expressed that she no longer wished to voluntarily surrender her parental rights. The court appointed a guardian ad litem and continued the hearing until March 14, 2008. Although the court had ordered supervised visitation at the Exchange Club at the July 5 hearing, no such visitation had taken place. Therefore, the parties went to register for supervised visitation following the November 28 hearing, and Mother began attending supervised visitation with Son in December of 2007.

On March 10, 2008, Mother filed an answer to the Wolfes' termination petition, alleging, among other things, that she was prevented from visiting with Son due to the Wolfes' failure to register him at the Exchange Club for supervised visitation. On March 11, 2008, Mother and Grandfather filed a joint petition to modify custody.

At the hearing on March 14, 2008, Mother's attorney argued that the Wolfes' termination petitions were void ab initio and subject to summary dismissal because they did not include the notices required by Tennessee Rule of Civil Procedure 9A.[9] Counsel for the Wolfes orally moved

---

[9] Rule 9A provides:

In addition to meeting all other applicable rules governing the filing of pleadings, any complaint or petition seeking a termination of parental rights shall contain the following notice: "Any appeal of the trial court's final disposition of the complaint or petition for termination of parental rights will be

(continued...)

for permission to add the required notice to their termination petitions and asked that the amendments be given effect retroactive to the original date of filing. The court denied Mother's oral motion to dismiss, allowed the Wolfes to file an amendment to their petition with retroactive effect, and set a new trial date.

Mother and Grandparents subsequently filed numerous additional motions and petitions. On March 24, 2008, Mother and Grandparents filed a joint "Petition for Preliminary Hearing and Return of the Minor Child to his Family," alleging various deficiencies in the earlier dependency and neglect proceedings. That same day, Mother filed an "Emergency Petition for Protective Custody," claiming that she thought the Wolfes were only taking temporary custody of Son and alleging that Son was suffering abuse and neglect in the Wolfes' care. On April 18, 2008, Mother filed a "Petition to Modify Visitation," again asserting various defects in the previous dependency and neglect proceedings, claiming that she thought the custody transfer to the Wolfes was only temporary and arguing that she was entitled to unsupervised visitation with Son. On April 22, 2008, Grandparents filed a "Petition for Hearing/Rehearing to Modify and Set Aside March 23, 2007 and July 5, 2007 Orders Concerning Custody and Related Matters Pertaining to [Son] and of All Orders Flowing Therefrom, and for Further Relief." Finally, Grandparents filed a motion to intervene in the termination proceedings filed by the Wolfes.

On April 30, 2008, the Wolfes filed the amendment to their termination petition, including the notice required by Tennessee Rule of Civil Procedure 9A. Trial was held on the Wolfes' termination petition on June 9 and June 10, 2008. Mother was 23 years old at the time of trial, and Son was two. Mother testified that Son was removed from her custody in May of 2006, when he was six months old, admitting that she and Son's Father were passed out in the doctor's office waiting room and were later arrested for domestic violence. Mother admitted that she had a history of drug abuse but claimed that she had not used drugs in over a year. Mother also testified that she was unable to care for Son in January of 2007 when she returned him to the DCS office. Mother admitted that Ms. Harris explained the criteria and procedures for terminating parental rights to her when the permanency plan was developed in February of 2007. She acknowledged that she was supposed to schedule a minimum of four hours per month of visitation with Son and said she knew that she could call Ms. Harris at any time to schedule visitation or just to check on Son. Mother claimed that she "sometimes" called Ms. Harris and left messages, and that Ms. Harris would not call her back, but Mother did not state when or how many times this happened. When asked how many times she visited Son between January and July of 2007, while he was in foster care, Mother said, "quite a few times," although she could not recall any specific dates. After counsel for the Wolfes suggested that Mother only visited Son once in February and once in June, Mother said that she had no explanation for why she did not visit Son for several months, and she admitted that she

[9](...continued)
governed by the provisions of Rule 8A, Tennessee Rules of Appellate Procedure, which imposes special time limitations for the filing of a transcript or statement of the evidence, the completion and transmission of the record on appeal, and the filing of briefs in the appellate court, as well as other special provisions for expediting the appeal. All parties must review Rule 8A, Tenn. R. App. P., for information concerning the special provisions that apply to any appeal of this case."

had the ability to do so. Mother later testified that she was "scared of confusing [Son] in his head," stating, "I didn't want him attached to me and then taken away, and me get attached to him and get taken away again because that hurt really bad."

Mother testified that she was aware of the Wolfes' desire to adopt Son, and that she initially agreed with the idea of them adopting him because she thought it was in Son's best interest. Mother claimed that after custody was transferred to the Wolfes in July of 2007, she was not aware that she could visit Son because when she contacted the Exchange Club about visitation, she learned that he was not registered there. However, Mother later admitted that she did not contact the Exchange Club about visitation until November of 2007. Mother also admitted that she never attempted to contact the Wolfes directly about visiting Son. Mother said she changed her mind about the adoption in November of 2007, around the time of Son's second birthday. Mother claimed that she currently had a stable job and employment. She testified that she had been employed at a local pub since September and that she had been living in a one-bedroom apartment for nearly one year.[10] However, she acknowledged that her "lease [would be] up on the 30th" and that she was not sure where she would live then.

Ms. Harris testified about her involvement with Son's case since January 29, 2007, when Mother brought him to the DCS office. She testified that Mother had visited with Son for one hour in February and one hour in June, and that she attempted to visit in May when Son's foster parent was unable to meet them. Ms. Harris testified that she tried to schedule visits with Mother on numerous occasions, but Mother either would not return her telephone calls, would not commit to a date, or would schedule a visit and then cancel it. Ms. Harris also stated that Mother did not call between visits to ask how Son was doing. Ms. Harris testified that, based upon her involvement with Son between January and July of 2007, she believed it was in his best interest for Mother's rights to be terminated and for the Wolfes to adopt him.

Mr. and Mrs. Wolfe testified that they intended to adopt Son if Mother's parental rights were terminated. Mr. Wolfe testified that he did not know that he was supposed to fill out paperwork at the Exchange Club in order for supervised visitation to take place. He testified that he and his wife gave Mother their home, work, and cellular telephone numbers when they first received custody of Son, and that Mother never called them for any reason or otherwise inquired about visitation. Mr. Wolfe also said that Mother did not ask about visitation when they saw her coincidentally at the fair in September of 2007. Mr. Wolfe explained that when Son first came to live with them, he would refer to any female who gave him food as "momma," but he said that Son no longer referred to random people as his mom and dad and only called him and Mrs. Wolfe "momma" and "daddy."

---

[10] Although Mother testified that she had been employed at the pub since September of 2006, Mother apparently confused her dates and meant to say September of 2007. She testified that when she took Son to the DCS office on January 29, 2007, she was working two jobs – one at a clothing store and a "side job . . . [at] a place called Food Staff." She also testified that she did not visit in April of 2007 because she had just started a new job and was going to bartending school.

The court also heard testimony from Grandfather and Grandmother regarding their involvement with Mother, Son, DCS, and the Wolfes. On July 22, 2008, the trial court entered an order terminating Son's father's parental rights by default and terminating Mother's parental rights on the ground that she abandoned Son by willfully failing to visit or engage in more than token visitation during the four months preceding the filing of the termination petition. Specifically, the court looked to the months of March, April, May, June, and July of 2007, as the Wolfes' original termination petition was filed on July 31, 2007. The court found that Mother made one attempt to visit in May of 2007, but actually only visited Son one time for one hour in June of 2007. The court concluded that Mother made a conscious decision not to visit Son, noting Mother's testimony that she thought it was best not to visit with Son. The court then found that it was in Son's best interest for Mother's rights to be terminated. The court found that Son had not been in a stable environment, as he had already lived in four different homes and was not yet three years old. The court noted that Mother had intended to surrender her parental rights to Son for some time, and that Son had bonded with the Wolfes. Although the court recognized that Mother had made "some strides in finding herself a job and an apartment," the court expressed concerns about the fact that Mother testified that her apartment lease would expire at the end of the month and that "she was not sure where she would go after that." The court stated its concern that if Mother regained custody of Son, he would soon be back in DCS custody. In sum, the court found that the only stability and permanency available to Son was with the Wolfes. The court denied the numerous motions and petitions filed by Grandparents and Mother.

Mother timely filed a notice of appeal to this Court. Grandparents also filed a notice of appeal to this Court, but they subsequently entered a "Stipulation for Dismissal of Appeal." Son's father did not appeal the termination of his parental rights. Thus, Mother is the only appellant.

## II. ISSUES PRESENTED

Mother presents the following issues, slightly restated, for review:

1. Whether James and Teri Wolfe had standing to file a petition to terminate parental rights;
2. Whether the trial court erred in failing to dismiss the termination petition because it failed to contain the notice required by Tennessee Rule of Civil Procedure 9A;
3. Whether the trial court erred in considering the four months prior to the Wolfes' original termination petition when determining whether Mother abandoned Son by willfully failing to visit;
4. Whether the evidence was clear and convincing that Mother willfully failed to visit Son;
5. Whether the trial court erred in determining that termination was in Son's best interest; and
6. Whether Mother and Grandparents were denied due process.

For the following reasons, we affirm the decision of the juvenile court.[11]

### III.   STANDARDS FOR REVIEWING TERMINATION CASES

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). Although the parent's right is fundamental and superior to the claims of other persons and the government, it is not absolute. *Id.* A parent's right "continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *Id.*; *see also In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In Tennessee, proceedings to terminate a parent's parental rights are governed by statute. *In re J.C.D.*, 254 S.W.3d at 438; *In re Audrey S.*, 182 S.W.3d at 860. "Parties who have standing to seek the termination of a biological parent's parental rights must prove two things." *In re Audrey S.*, 182 S.W.3d at 860; *see also In re M.J.B.*, 140 S.W.3d at 653. First, they must prove the existence of at least one of the statutory grounds for termination, which are listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, they must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *Id.* Because no civil action carries graver consequences than a petition to sever family ties forever, a person seeking to terminate parental rights must prove both of the elements for termination by clear and convincing evidence. *Id.* at 860-61. In sum, "[t]o terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). Clear and convincing evidence has been defined as evidence that

---

[11] After oral argument, this Court *sua sponte* directed the parties to file supplemental briefs to set forth the basis upon which Special Judge Lane, a juvenile court referee, exercised his authority over this case. The order was signed by "Juvenile Court Special Judge Herbert J. Lane," but the record does not otherwise indicate the basis for his authority to hear the case. According to the Wolfes, Special Judge Lane was appointed as the judge pursuant to Tennessee Code Annotated § 17-2-122, which authorizes the appointment of a special judge "where a judge finds it necessary to be absent from holding court." The record contains no such appointment.

This Court recently addressed this same issue involving Special Judge Lane in *In re M.A.P.*, No. W2008-01352-COA-R3-PT, 2009 WL 2003357, at *13 n.11 (Tenn. Ct. App. July 10, 2009). We explained that "[t]he Tennessee Supreme Court has discussed at length the proper procedures to be followed when appointing a special judge under these statutes, and has emphasized the requirement that a judge's absence be 'necessary' to warrant the appointment." *Id.* (citing *Ferrell v. Cigna Prop. & Cas. Ins. Co.*, 33 S.W.3d 731, 737-38 (Tenn. 2000)). However, we also explained that "even if the proper procedures are not followed under the statute, the special judge's decision will be binding on the parties if he is acting as a de facto judge, *i.e.*, in good faith under color of right." *Id.* (citing *Ferrell*, 33 S.W.3d at 739; *Tenn. Dep't Human Servs. v. A.M.H. (In re A.B.)*, 198 S.W.3d 757, 764 (Tenn. Ct. App. 2006)). We concluded that "regardless of whether the proper procedures were followed in appointing Special Judge Lane to preside over the case, he was appointed under color of law, and there is nothing in the record indicating that he acted in bad faith." *Id.* Therefore, we held that Special Judge Lane acted as a de facto judge and considered the merits of the appeal. We will follow the Court's decision in *In re M.A.P.* and proceed to address the issues presented on appeal.

"eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence." *In re L.J.C.*, 124 S.W.3d 609, 619 (Tenn. Ct. App. 2003) (quoting *In the Matter of: C.D.B., S.S.B., & S.E.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000)). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Audrey S.*, 182 S.W.3d at 861.

Because of the heightened burden of proof in parental termination cases, on appeal, we must adapt our customary standard of review as set forth in Tennessee Rule of Appellate Procedure 13(d). *In re Audrey S.*, 182 S.W.3d at 861. First, we review each of the trial court's specific factual findings de novo in accordance with Rule 13(d), presuming the finding to be correct unless the evidence preponderates against it. *Id.* Second, we must determine whether the facts (either as found by the trial court or as supported by the preponderance of the evidence) clearly and convincingly establish the elements required to terminate parental rights. *Id.* "As a question of law, the trial court's ruling that the facts of this case sufficiently support the termination ground of willful abandonment [is] reviewed de novo with no presumption of correctness." *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007).

## IV. DISCUSSION

### A. Standing

A court may not terminate a parent's rights to his or her children unless there is specific statutory authority to do so. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). "Because the legislature specifically designated who may file a petition to terminate parental rights, a court does not have subject matter jurisdiction to hear such a petition unless the party filing the petition has standing." *Id.* at 740.

Tennessee Code Annotated section 36-1-113(b) provides an "exclusive list" of persons or entities who have standing to file a petition to terminate parental rights. *In re M.L.P.*, 281 S.W.3d 387, 391 (Tenn. 2009). In other words, "absent statutory authorization under Tennessee Code Annotated section 36-1-113(b), a party has no standing to file a petition to terminate parental rights." *Osborn*, 127 S.W.3d at 741. Section 36-1-113(b) provides:

> The prospective adoptive parent or parents, including extended family members caring for a related child, any licensed child-placing agency having custody of the child, the child's guardian ad litem, or the department shall have standing to file a petition pursuant to this part or title 37 to terminate parental or guardianship rights of a person alleged to be a parent or guardian of the child. The prospective adoptive parents, including extended family members caring for a related child, shall have standing to request termination of parental or guardianship rights in the adoption petition filed by them pursuant to this part.

According to Tennessee Code Annotated section 36-1-102(41),

"Prospective adoptive parents" means a non-agency person or persons who are seeking to adopt a child *and* who have made application with a licensed child-placing agency or licensed clinical social worker or the department for approval, or who have been previously approved, to receive a child for adoption, or who have received or who expect to receive a surrender of a child, or who have filed a petition for termination or for adoption[.]

(emphasis added). At trial, Mother did not dispute that the Wolfes were "prospective adoptive parents."[12] The Wolfes' termination petition sought custody with the right to proceed with adoption, and they both testified at trial that they intended to adopt Son if Mother's rights were terminated. Thus, the Wolfes were "seeking to adopt [Son]." In addition, the Wolfes "expect[ed] to receive a surrender of [Son]" and also "filed a petition for termination." Thus, they met the statutory definition of prospective adoptive parents.

Nevertheless, Mother claims that the Wolfes , as prospective adoptive parents, "could only gain standing to terminate in an adoption petition." As support for this argument, Mother relies upon the second sentence of section 36-1-113(b), which states, "The prospective adoptive parents, including extended family members caring for a related child, shall have standing to request termination of parental or guardianship rights in the adoption petition filed by them pursuant to this part." Mother interprets this sentence to mean that prospective adoptive parents shall *only* have standing to request a termination of parental rights in an adoption petition. The Wolfes, on the other hand, read this sentence as permissive and claim that it simply provides clarification that prospective adoptive parents may request termination of parental rights within an adoption petition.[13] The trial court agreed with the Wolfes' reading of the statute. So do we.

The first sentence of section 36-1-113(b) provides, without limitation, that prospective adoptive parents have standing to file a termination petition. Although the second sentence states that prospective adoptive parents have standing to request termination in an adoption petition, it does *not* state that they have standing *only* in an adoption petition. In several previous cases, we have found that petitioners qualified as prospective adoptive parents with standing to file a termination petition, even though they had not yet filed an adoption petition, if they indicated that they intended to adopt the child in the future. For example, in ***In re Marr***, 194 S.W.3d 490, 494-95 (Tenn. Ct.

---

[12] The following exchange took place between the court and counsel for Mother:

Mr. Glasgow:   36-1-113 states who has standing here. Mr. and Mrs. Wolfe do not have standing.
                          . . .
The Court:       Tell me who has standing.
Mr. Glasgow:   Prospective adoptive parents –
. . . .
The Court:       Well, stop right there. Isn't that what they are?
Mr. Glasgow:   Yes, sir, they are.

[13] The Wolfes' brief states that they could not file an adoption petition in Tennessee because they reside in DeSoto County, Mississippi.

-14-

App. 2005), a mother and stepfather filed a petition seeking to terminate the father's parental rights. The stepfather "asserted his desire to adopt the child if Mr. Marr's parental rights were terminated." *Id.* at 495. Therefore, the Court concluded that the stepfather was a prospective adoptive parent with standing to file the termination petition. *Id.* at 495 n.9. Similarly, in *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *2 (Tenn. Ct. App. Mar. 9, 2004), the Court concluded that petitioners had standing to file a termination petition as prospective adoptive parents because they alleged in their petition that they were "potential adoptive parents."

In *In re Audrey S.*, 182 S.W.3d 838, 859 (Tenn. Ct. App. 2005), the parties who filed the termination petition testified that they were "ready and willing to adopt" the children if the mother's rights were terminated. However, they had not yet filed a petition to adopt them. *Id.* at 859 n.21. The mother argued that, as a matter of policy, termination was improper because there was no evidence that the children would be adopted if her rights were terminated. *Id.* at 879. The Court rejected the mother's argument because the petitioners had testified that they intended to adopt the children if the mother's rights were terminated, explaining that, "[a]t most, Tennessee law requires only that an adoption be contemplated at some point in the future." *Id.*

The Wolfes stated in their termination petition that the were seeking custody with the right to proceed with adoption, and they testified at trial that they intended to adopt Son if Mother's rights were terminated. As such, we conclude that they had standing to petition to terminate Mother's parental rights even though they had not yet filed an adoption petition.[14]

## B. Rule 9A

Next, Mother contends that the trial court should have dismissed the Wolfes' termination petition as void ab initio because they failed to contain the notice required by Tennessee Rule of Civil Procedure 9A, which provides:

> In addition to meeting all other applicable rules governing the filing of pleadings, any complaint or petition seeking a termination of parental rights shall contain the following notice: "Any appeal of the trial court's final disposition of the complaint or petition for termination of parental rights will be governed by the provisions of Rule 8A, Tennessee Rules of Appellate Procedure, which imposes special time limitations for the filing of a transcript or statement of the evidence, the completion and transmission of the record on appeal, and the filing of briefs in the appellate court, as well as other special provisions for expediting the appeal. All parties must

---

[14] At times, Mother's brief also appears to argue that the Wolfes were not prospective adoptive parents. She claims that the statutory definition of prospective adoptive parent is vague and ambiguous, and that it is "unreasonable and unconscionable" to utilize "the circular reasoning that a 'prospective adoptive parent' is anyone 'who has filed a petition for termination.'" Mother apparently overlooks the portion of the definition of prospective adoptive parent requiring that the petitioner also be "seeking to adopt" the child. *See* **Tenn. Code Ann. § 36-1-102(41).** In any event, Mother admitted at trial that the Wolfes were prospective adoptive parents, and we decline to address the issue further on appeal.

review Rule 8A, Tenn. R. App. P., for information concerning the special provisions that apply to any appeal of this case."

Mother claims that the trial court erred in allowing the Wolfes to file an amendment to their petition to be given effect retroactive to the date of the original filing.

Rule 9A became effective July 1, 2004, but it has only been discussed in one case to our knowledge. In *In re S.R.M.*, No. E2008-01359-COA-R3-PT, 2009 WL 837715, at *14 (Tenn. Ct. App. Mar. 27, 2009), DCS filed a petition to terminate a father's parental rights and failed to include the notice required by Rule 9A. The father moved to dismiss the petition, but the trial court denied the motion and allowed DCS to file an amendment to the petition, containing the required notice. *Id.* On appeal, the Eastern Section of this Court affirmed the juvenile court's decision. *Id.* at *15. The Court explained that the notice required by Rule 9A addresses matters that do not come into play until a case is on appeal, and therefore the father was not prejudiced by DCS's failure to include the notice in its original petition. *Id.* As such, the Court found that any error was harmless and the juvenile court properly allowed DCS to amend its petition. *Id.* We agree with the Court's reasoning in *In re S.R.M.* and hold that the trial court did not err in denying Mother's oral motion to dismiss or in allowing the Wolfes to file an amendment to their petition to include the required notice.

### C. Abandonment by Willful Failure to Visit

Next, Mother claims that the trial court erred in concluding that she abandoned Son by willfully failing to visit him.

Several grounds for termination are listed in Tennessee Code Annotated section 36-1-113(g), but the existence of any one of the grounds enumerated in the statute will support a decision to terminate parental rights, *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004), provided that termination is in the best interest of the child. *In re Audrey S.*, 182 S.W.3d at 862. The first ground for termination listed in the statute, and the one most frequently relied on, is abandonment. *Id.* There are five alternative definitions of abandonment listed in Tennessee Code Annotated section 36-1-102(1)(A)(i)–(v) for purposes of terminating parental rights. Pursuant to the first definition, which is the one relevant to this case, "abandonment" means that:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; . . . .

Tenn. Code Ann. § 36-1-102(1)(A)(i). Abandonment can be established by showing that a parent *either* willfully failed to visit *or* willfully failed to support the child during the relevant time period.

-16-

*In re Adoption of McCrone*, No. W2001-02795-COA-R3-CV, 2003 WL 21729434, at *10 (Tenn. Ct. App. July 21, 2003). The relevant time period is the four months immediately preceding the filing of the termination petition currently before the court. *In re D.L.B.*, 118 S.W.3d 360, 366 (Tenn. 2003).

During that four-month period, the parent must have engaged in more than "token visitation" to avoid a finding of abandonment. Tenn. Code Ann. § 36-1-102(1)(E). "'[T]oken visitation' means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Tenn. Code Ann. § 36-1-102(1)(C). In addition, "[a]bandonment may not be repented of by resuming visitation . . . subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child." Tenn. Code Ann. § 36-1-102(1)(F).

In this case, the Wolfes actually filed three termination petitions. The first was the "Petition for Termination of Parental Rights," filed July 31, 2007, which alleged that Son's father had abandoned him, that Mother intended to voluntarily surrender and terminate her parental rights, and that it was in Son's best interest for both parents' rights to be terminated. On November 6, 2007, the Wolfes filed the "Amended Petition for Termination of Parental Rights," alleging that both parents had abandoned Son and that Mother had failed to appear at the scheduled voluntary surrender proceedings. Then, on April 30, 2008, they filed the "Amendment to Amended Petition for Termination of Parental Rights," which included the notice required by Tennessee Rule of Civil Procedure 9A. The trial judge ruled that all amendments related back to the original filing date of July 31, 2007, and considered the four-month period immediately preceding that first petition in its abandonment analysis.

On appeal, Mother argues that the trial court should have considered the four-month period preceding April 30, 2008, when the amendment was filed containing the Rule 9A notice. This would clearly benefit Mother because she began visiting with Son at the Exchange Club in December of 2007. The father in *In re S.R.M.* made the same argument on appeal when the juvenile court allowed DCS to amend its petition to include the required notice, but considered the four-month period prior to the original petition for purposes of abandonment. 2009 WL 837715, at *15. That father also began visiting with his child during the interim period. *Id.* Still, the Court concluded that the amendment containing the notice did not constitute a separate and distinct petition, and therefore the proper four-month period was the one prior to the original petition. *Id.* We agree, as the Wolfes' amendment to the amended petition added nothing more than the notice required by Rule 9A. We reject Mother's argument that the trial court was limited to considering the four-month period preceding the amendment.

Regardless of whether the trial court then looked to the four-month period preceding the original petition filed July 31, 2007, or the four months preceding the amended petition filed November 6, 2007, clear and convincing evidence existed that Mother willfully failed to visit Son during either period. After Son entered DCS custody on January 29, 2007, Mother only attended two

one-hour visits with Son – on February 26, 2007, and June 25, 2007. We note that Mother attempted to visit Son on May 31, 2007, when the foster mother had a conflict, but she did not reschedule the visit despite Ms. Harris's attempts to do so. The only other times when Mother saw Son between January and November of 2007 were at the July 5 hearing, when Son was present with the Wolfes, and coincidentally at the fair in September of 2007. These four encounters between Son and Mother over a period of eleven months clearly constitute no more than "token visitation," in that "the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Tenn. Code Ann. § 36-1-102(1)(C).

Mother argues that her failure to visit Son throughout this period was not willful. First, Mother claims that the evidence presented at trial shows that she tried to visit Son on March 16, 2007, but that she was denied because a visit was already scheduled with Grandparents. However, the evidence does not support Mother's assertion. Ms. Harris testified that Mother called to cancel the March 16 visit because she would be returning from a trip with her boyfriend that day. Mother argues that "[t]he assertion that Mother called and cancelled is not documented and it falls short of being clear and convincing evidence that Mother willfully failed to visit on the one time offered her during the month of March." However, we find documentary evidence of Mother's cancellation in the DCS records, prepared by Ms. Harris on March 8, 2007, which state that Ms. Harris contacted Mother to confirm the March 16 visit, and Mother stated that she wanted to cancel the visit because she would be returning from a trip with her boyfriend that day. In addition, Mother presented no evidence or testimony to suggest that she did not cancel the March 16 visit.

Next, Mother claims that her actions cannot be considered a "willful failure to visit" because, as stated above, Mother testified that she did not visit Son because she was "scared of confusing [Son] in his head." She explained, "I didn't want him attached to me and then taken away, and me get attached to him and get taken away again because that hurt really bad." Mother argues on appeal that this testimony demonstrates that she acted "selflessly and courageously" in order to "spare her child any more possible heartbreak." She also claims that no one ever advised her "that visitation was more important than finding stable employment and housing."

"The requirement that the failure to visit or support be 'willful' is both a statutory and a constitutional requirement." *In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *17 (Tenn. Ct. App. W.S. May 4, 2005). Therefore, the element of willfulness is essential, and central to the determination of abandonment. *In re M.L.D.*, 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005); *In re C.M.C.*, No. E2005-00328-COA-R3-PT, 2005 WL 1827855, at *6 (Tenn. Ct. App. Aug. 3, 2005). However, willfulness in the context of termination proceedings does not require the same standard of culpability as is required by the penal code, nor does it require that the parent have acted with malice or ill will. *In re Audrey S.*, 182 S.W.3d at 863; *see also In re S.M.*, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004). Rather, a parent's conduct must have been willful in the sense that it consisted of intentional or voluntary acts, or failures to act, rather than accidental or inadvertent acts. *Id.* Willful conduct is the product of free will rather than coercion. *Id.* A person acts willfully if he or she is a free agent, knows what he or she is doing, and intends

to do what he or she is doing. *Id.* at 863-64. "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *Id.* at 864 (citing *In re M.J.B.*, 140 S.W.3d at 654).

The question of intent or willfulness depends on the totality of the circumstances, and the facts must be applied to the standard definition of willfulness. *V.D. v. N.M.B.*, No. M2003-00186-COA-R3-CV, 2004 WL 1732323, at *6 (Tenn. Ct. App. July 26, 2004). Willfulness of a parent's conduct depends upon his or her intent, and intent is seldom capable of direct proof. *In re Audrey S.*, 182 S.W.3d at 864 (citing *In re Adoptoin of S.M.F.*, No. M2004-00876-COA-R9-PT, 2004 WL 2804892, at *8 (Tenn. Ct. App. Dec. 6, 2004)). Triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations and must infer intent from circumstantial evidence, including the parent's actions or conduct. *Id.* A person's demeanor and credibility as a witness also play an important role in determining intent. *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. Nov. 25, 2003). Because testimony may be critical to the determination of whether a parent's conduct was willful, trial courts are the proper courts to make a determination of willfulness. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Keeping these principles in mind, we find clear and convincing evidence that Mother's failure to visit Son was willful, as she was "aware of . . . her duty to . . . [visit or] support, ha[d] the capacity to do so, ma[de] no attempt to do so, and ha[d] no justifiable excuse for not doing so." *See In re Audrey S.*, 182 S.W.3d at 864. "[P]arents should know that they have a responsibility to visit their children." *In re M.L.P.*, 281 S.W.3d 387, 392 (Tenn. 2009). In addition, Mother admits that Ms. Harris explained the criteria for terminating parental rights to her in February of 2007. She also agreed to the permanency plan requiring her "to schedule family visits with a minimum of four hours per month." Mother admitted she knew that she could call Ms. Harris at any time to schedule visitation or just to check on Son. Mother testified that she had no explanation for why she did not visit Son for several months, and she admitted that she had the ability to do so. **(p.84).** In May of 2007, when Ms. Harris went to Mother's boyfriends' parents' house unannounced and asked Mother about scheduling visitation, Mother stated that she did not want to visit with Son because she "[did] not want it to be hard for him if something happen[ed]." Mother clearly made a conscious decision not to visit Son. We are not required to find malice or ill will in order to find willfulness. Mother's actions clearly demonstrate a willful failure to visit.

Mother also argues that her failure to visit was not willful because the Wolfes "purposely did not register the child at the Memphis Exchange Club, the only way Mother could have visited her son." Tennessee courts have held that when a parent attempts to visit his or her child but is "thwarted by the acts of others," the failure to visit was not willful. *In re M.L.P.*, 281 S.W.3d at 392. However, "[the] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *Id.* at 393 (citing *In re Audrey S.*, 182 S.W.3d at 864). Some examples of conduct that amounts to such a significant restraint or interference includes: (1) telling a man that he is not the child's biological father; (2) blocking access to the child; (3) keeping

the child's whereabouts unknown; (4) vigorously resisting a parent's efforts to support the child; or (5) vigorously resisting a parent's efforts to visit the child. *In re Audrey S.*, 182 S.W.3d at 864 n.34. At the July 5 hearing, both the Wolfes and Mother were orally instructed to register at the Exchange Club for supervised visitation. The Wolfes admit that they did not register at the Exchange Club until November of 2007. However, Mother also testified that *she* did not attempt to contact the Exchange Club about visitation until November of 2007, and that she never contacted the Wolfes directly to inquire about visitation. The amended termination petition was filed November 6, 2007. Therefore, the Wolfes' failure to register at the Exchange Club did not "actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child," and Mother was not excused from visiting Son. *See In re M.L.P.,* 281 S.W.3d at 392.

Finally, Mother argues that "TDCS in Shelby County provides only four hours a month of supervised visitation as a matter of policy. This policy restriction in itself thwarts visitation and is in violation of Tenn. Code Ann. § 36-6-301." There is nothing in the record to support Mother's assertion, and it was not raised in the trial court. Therefore, we will not consider it.

### D. Best Interest

Mother next argues that the trial court erred in concluding that it was in Son's best interest for Mother's parental rights to be terminated. "To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d at 530.

> In determining whether termination of parental or guardianship rights is in the best interest of the child . . . , the court shall consider, but is not limited to, the following:
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). Mother points out that the trial court's order did not specifically reference these statutory factors. However, "[t]here is no requirement that the trial court make a written finding on each of the enumerated Section 36-1-113(i) factors." *In re Adoption of K.B.H.*, 206 S.W.3d 80, 85 (Tenn. Ct. App. 2006). The best interest analysis "does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *In re Audrey S.*, 182 S.W.3d at 878. Rather, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.*

In this case, the trial court's factual findings indicate that it considered many of the aforementioned statutory considerations in its best interest analysis. After reviewing the statutory factors in light of the facts previously discussed, we readily agree with the trial court's conclusion that it is in Son's best interest for Mother's parental rights to be terminated. At the time of trial, Son was two years old, and he had not lived with Mother since he was six months old, with the exception of the few months he and Mother both resided at Grandparents' house. As noted by the trial court, Son had lived in four different homes during his short lifetime. Son had lived with the Wolfes for almost one year at the time of trial. Thus, terminating Mother's parental rights would not require a change in Son's caretakers or physical environment. In addition, Mother had not maintained regular contact or visitation with Son. Between January and November of 2007, Mother visited with Son for a total of about three hours. Mother did not contact Son's foster parents or the Wolfes during that time to ask about Son, and she did not financially support Son or send him cards or gifts, even on his birthday. When Son went to live with the Wolfes, he called any female who fed him, "momma." Although Mother had resumed supervised visitation with Son at the Exchange Club at the time of trial, Son called the Wolfes "momma" and "daddy," and the trial court recognized the bond that existed between them and Son. The court found that the only people who could be counted on to provide stability and permanency for Son were the Wolfes. Although Mother was working at a local pub and renting an apartment, she did not know where she would go when her lease expired in three weeks. The trial court's final order expressed "concerns that the child will be back in the State's custody if the Court places the child back with Mother." The best interest of the child is to be determined from the perspective of the child rather than the parent. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). After a careful review of the record, it is our determination that the juvenile court's ruling is well supported and should be affirmed.

## E.    Due Process

Mother's final issue questions "[w]hether Mother and Grandparents of [Son] were afforded the due process protections guaranteed by the Tennessee State Statutes and both the Federal and State Constitutions." We find Mother's argument regarding this issue somewhat difficult to follow, but we will attempt to address the various issues she mentions in her brief.

First, Mother alleges that various errors were committed by DCS and the juvenile court during the dependency and neglect proceedings and prior to the termination proceedings. However, we will not consider these issues because this is an appeal from the order terminating Mother's parental rights, not an appeal of the dependency and neglect proceeding, which was a separate case. "A termination of parental rights proceeding is not simply a continuation of a dependent-neglect proceeding." *In re M.J.B.*, 140 S.W.3d 643, 651 (Tenn. Ct. App. 2004). Dependency and neglect proceedings are separate and distinct from termination proceedings. *In re L.A.J., III*, No. W2007-00926-COA-R3-PT, 2007 WL 3379785, at *6 (Tenn. Ct. App. Nov. 15, 2007). Mother did not appeal the order finding Son dependent and neglected, and it became final. *See* Tenn. Code Ann. § 37-1-159(a) ("[A]ny appeal from any final order or judgment in an unruly child proceeding or dependent and neglect proceeding . . . may be made to the circuit court that shall hear the testimony of witnesses and try the case de novo. The appeal shall be perfected within ten (10) days, excluding nonjudicial days, following the juvenile court's disposition. ").

Mother also argues that there was never "a finding against [Mother] of abuse, dependency, neglect, unfitness, or harm of any kind against her child" prior to the trial court's order terminating her parental rights on July 22, 2008. We note that an order *was* entered by the juvenile court on March 23, 2007, finding Son dependent and neglected within the meaning of Tennessee Code Annotated section 37-1-102(b)(12)(F). But in any event, "[a] dependency and neglect proceeding is not a prerequisite to every termination proceeding." *In re G.L.T.*, No. M2008-00582-COA-R3-PT, 2008 WL 3914922, at *8 n.6 (Tenn. Ct. App. Aug. 25, 2008). "This court has repeatedly recognized that the statutory grounds for termination of parental rights listed in Tenn. Code Ann. § 36-1-113(g) are all examples of parental conduct and situations that render a parent unfit or pose a risk of substantial harm to the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 881 (citations omitted). "Thus, as long as the juvenile court has correctly found that at least one of the statutory grounds for termination of parental rights exists, the constitutional requirement of a showing of parental unfitness or a risk of substantial harm to the welfare of a child has been satisfied." *Id.* at 882. We have already concluded that the trial court properly found that a ground for terminating Mother's parental rights existed.

Next, Mother attempts to assert that Grandparents' constitutional rights were violated at various stages of these proceedings and that custody of Son should be returned to them. As previously discussed, Grandparents filed various motions and petitions in the trial court, which were denied, and they initially filed a notice of appeal to this Court. However, Grandparents dismissed their notice of appeal, and Mother is the only appellant in this case. Mother cannot simply assert Grandparents' rights or seek relief on their behalf on appeal.

Finally, Mother argues that she was "never provided effective assistance of counsel at any time while her child was in the hands of [DCS]." Mother does not dispute that an attorney was appointed for her during the dependency and neglect proceedings, but she claims that she had minimal contact with him and that he misrepresented her position at the hearing on March 23, 2007. We have previously held that "any violation of a parent's due process rights at the dependency and neglect proceeding is remedied by the procedural protections afforded him during the termination proceeding, including the appointment of an attorney." *In re L.A.J., III*, 2007 WL 3379785, at \*6 (citing *In re S.Y.*, 121 S.W.3d 358, 366 (Tenn. Ct. App. 2003)).

Mother testified that she was present at the July 5 hearing, when custody was transferred from DCS to the Wolfes, and that she did not request an attorney because she "didn't want one." The Wolfes' first termination petition was filed on July 31. Mr. Wolfe testified that when Mother came to the surrender hearing on September 12, 2007, to sign the surrender documents, the referee made certain that Mother was aware of her rights to an attorney, and Mother was asked if she wanted an attorney, but she declined. Mother testified that she could not recall whether she was asked about an attorney at the surrender hearing. However, she admitted that she did not ask for an attorney until the next hearing when she first indicated that she no longer wanted to surrender her parental rights. The court continued the matter and appointed Mother's current attorney, and Mother does not allege that her current attorney was ineffective in representing her throughout the termination proceedings. Under all of these circumstances, the alleged ineffectiveness of Mother's previously appointed counsel is not a ground for reversing the termination of Mother's parental rights on appeal.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the juvenile court. Costs of this appeal are taxed to the appellant, Jennifer Duckhorn, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.