IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 1, 2024

**IN RE BRIAN Z. ET AL.**

**Appeal from the Juvenile Court for Campbell County**
**No. 2023-JC-113    William C. Jones, Judge**

_____

**No. E2024-00398-COA-R3-PT**

_____

Father appeals the termination of his parental rights, arguing that termination was not in his child's best interests. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which THOMAS R. FRIERSON, II and JEFFREY USMAN, JJ., joined.

Andrew J. Crawford, Knoxville, Tennessee, for the appellant, Willie D.

Jonathan Skrmetti, Attorney General and Reporter; Amber L. Barker, Senior Assistant Attorney General, for the appellee, State of Tennessee, Tennessee Department of Children's Services.

**OPINION**

**I. FACTUAL AND PROCEDURAL BACKGROUND**

On November 14, 2022, Petitioner/Appellee the Tennessee Department of Children's Services ("DCS") filed a petition to declare two children, Brian Z., born in December 2006, and Nevaeh D., born in February 2017, dependent and neglected.[1] The petition alleged that the children were removed from the physical custody of Respondent Anita Z. ("Mother"), and that the whereabouts of Nevaeh's father, Respondent/Appellant Willie D. ("Father"), were unknown. The same day, the Campbell County Juvenile Court

_____

[1] In cases involving termination of parental rights, it is this Court's policy to remove the full names of children and other parties to protect their identities.

("the trial court") issued an ex parte restraining order removing the children from Mother's and Father's legal custody and placed them in DCS custody. Eventually, the trial court adjudicated the children dependent and neglected by order of January 11, 2023, based on the parent's stipulation to lack of supervision and the allegations in the petition. This appeal concerns only the parental rights of Father to Nevaeh.

DCS created the first permanency plan in this case on December 6, 2022. Father was provided with a copy of the plan during a court hearing. The plan contained several action steps for Father, most of which were related to concerns about Father's drug use, Father's lack of suitable home, and Father's lack of stable income. DCS also read the Criteria & Procedures for Termination of Parental Rights to Father in December 2022. A permanency plan with similar requirements was created on June 5, 2023.

Eventually, DCS filed a petition to terminate both parents' parental rights on June 15, 2023. The petition alleged the following grounds against Father: (1) abandonment by failure to visit; (2) abandonment by failure to pay support; (3) abandonment by failure to establish a suitable home; (4) substantial noncompliance with permanency plans; (5) persistence of conditions; and (6) failure to manifest an ability or willingness to parent.

Trial occurred on January 31, 2024. The child's current and former DCS caseworkers were the only witnesses to testify. The proof showed that Father engaged in fairly regular visitation twice monthly with the child,[2] first in-person and then over ZOOM, when he moved approximately three hours away from where the child was placed.[3] Father did miss some in-person visits due to lack of transportation. DCS facilitated and supervised the visits. According to both DCS workers assigned to this case, the visits went well and a bond between Father and the child was evident during the visitation. Father also engaged in weekly phone calls with the child.

But Father had never been able to establish a suitable home in the time that the child had been in DCS custody. The proof shows that Father was not living with Mother when the child was initially removed. While Father claimed to live in Knoxville at that time, he never provided the first caseworker, Belinda McCullah, with an address for that residence. Father later returned to living with Mother, but their home was not suitable. They first lived with a friend, but a home visit found that the walls and floor of the home had holes, that there was exposed wiring, that the home had no running water or heat, and was missing an exterior door. Mother and Father next moved to a hotel room, which had a single bed and was obviously temporary. After the termination petition was filed, Mother and Father moved to a relative's home that was three hours away from where the child was placed, but Father did not provide DCS with an address for that home. In September 2023, Father

---

[2] The child's half-sibling also participated in the visitation, first in-person, then via ZOOM when the older sibling's placement changed.

[3] Following the move, one in-person visitation occurred in December 2023 for Christmas.

provided the second DCS caseworker, Brandon Bailey, with a new address. An unscheduled home visit revealed that the home was a camper owned by an individual who allowed Mother and Father to live on the property. According to Mr. Bailey, the camper was in rough shape and there was clutter and trash both inside and outside. Mr. Bailey further testified that the camper was so small that he could see the living space just standing at the door. Mr. Bailey further testified that Mother and Father informed him that the camper lacked running water or electricity.

In order to address the housing issues, both DCS workers spoke with Mother and Father and provided them with resources to gain stable housing. After the parents informed DCS that they could not obtain government housing due to an unpaid debt, Ms. McCullah provided Mother and Father with a list of private landlords that they could contact for housing. Ms. McCullah also offered to help Father with the housing applications. Mr. Bailey also provided Father with a packet of resources for housing in his new county. Father never asked for any additional assistance with housing.

Although Mother and Father brought the child Christmas gifts in December 2023, Father never paid the $50.00 to $100.00 per month in child support that he was required to pay under the permanency plan. Father did provide two pay stubs to DCS in February 2023, but he lost the job in May 2023, and provided no other proof of employment either before or after this time period. Ms. McCullah testified that she provided Father with several resources to obtain employment, including websites and local staffing companies that he could visit.

Father did not have a driver's license, as it was revoked; he was required to pay a fine before it could be reinstated. Father also never provided DCS with any transportation plan. Both caseworkers testified that they provided the parents with information about "ETHRA" in order to address their lack of transportation.[4] When visitation was in-person, Father missed some visits due to transportation issues.

Father completed an alcohol and drug assessment and a mental health assessment. The mental health assessment did not include any recommendations; the alcohol and drug assessment recommended that Father participate in, inter alia, a "STOP" drug treatment program. DCS therefore arranged for Father to participate in the STOP program, as Father was required to follow recommendations of the assessments under the permanency plan. Ms. McCullah had difficulty enrolling Father because he would not return her phone calls.[5] Father did eventually enroll in the program in March 2023, but attended a few meetings before he refused to continue with the program. Father was also asked on multiple

_____

[4] "ETHRA provides door-to-door transportation services to the public for a fee . . . ." *Wilson v. E. Tennessee Hum. Res. Agency, Inc.*, No. E2010-01712-COA-R3-CV, 2011 WL 1642441, at *8 (Tenn. Ct. App. Apr. 29, 2011).
[5] The only way to communicate with Father was through Mother's cell phone.

occasions to take random drug screens. He only took four, one of which was positive for opiates in February 2023. His most recent drug screening in November 2023 was negative for all substances.

Father also participated in parenting classes, but did not complete the program at that time. In the fall of 2023, Father asked Mr. Bailey about re-enrolling in the parenting classes, which had apparently stopped due to an issue with the provider. Mr. Bailey arranged for the parenting classes to continue. It is unclear if the parenting class was successfully completed after the re-enrollment.

Following the removal, the child was placed in temporary respite care for a few weeks, then placed with her current foster family in December 2022.[6] At the time of the placement, the child could communicate only with grunts. While under the care of the foster family, the child has been diagnosed with autism. Now, the child can communicate more clearly and is doing better in school. The child was also not potty-trained at the time of the removal but has made progress. The child participates in speech therapy through her school and Applied Behavioral Analysis therapy, which her foster family transports her to. According to Mr. Bailey, the child's foster family lives on a farm, so when he visits, he often observes the child playing outside with the animals or showing him her bicycle. According to Mr. Bailey, she child has flourished into a "happy-go-lucky kid."

The trial court issued a written order terminating Father's and Mother's parental rights to the child on February 26, 2024. As to Father, the trial court found the following grounds for termination were proven by clear and convincing evidence: (1) abandonment by failure to pay support; (2) abandonment by failure to establish a suitable home; (3) persistence of conditions; and (4) failure to manifest an ability or willingness to parent. The trial court also found that termination of Father's parental rights was in the child's best interest. From this order, Father now appeals.[7]

## II. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." ***In re Carrington H.***, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). Therefore, "parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." ***Id.*** at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." ***Id.*** at 522 (quotation marks and citations omitted). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002) (quotation marks and citation omitted).

---

[6] The child's half-sibling was placed elsewhere due to issues of availability.

[7] As previously discussed, Mother did not participate in this appeal.

In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which [the] state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *See In re Valentine*, 79 S.W.3d at 546. "Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases." *In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018). The clear and convincing evidence standard applicable here is "more exacting than the 'preponderance of the evidence' standard, although it does not demand the certainty required by the 'beyond a reasonable doubt' standard. To be clear and convincing, the evidence must eliminate any substantial doubt and produce in the fact-finder's mind a firm conviction as to the truth." *In re S.R.C.*, 156 S.W.3d 26, 29 (Tenn. Ct. App. 2004) (internal citation omitted).

Because of the high standard of proof in termination cases, the standard of review is somewhat different than our typical standard under Rule 13 of the Tennessee Rules of Appellate Procedure. As the Tennessee Supreme Court recently explained:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).
>
> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo

review with no presumption of correctness. *See **In re M.L.P.**, 281 S.W.3d 387, 393 (Tenn. 2009); see also **In re Samaria S.**, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. **In re Angela E.**, 303 S.W.3d [240,] 246 [Tenn. 2010)].*

**In re Markus E.**, 671 S.W.3d 437, 457 (Tenn. 2023).

## III. ANALYSIS

Any termination of parental rights appeal involves two over-arching issues: whether the trial court erred in finding clear and convincing evidence of grounds to terminate Father's parental rights; and, if so, whether termination of Father's parental rights is in the child's best interests. *See **In re Carrington H.**, 483 S.W.3d at 525–26. Although Father did not appeal the grounds for termination, we will nevertheless briefly but thoroughly address the grounds found by the trial court before considering the child's best interest. **Id.***

### A. Grounds for Termination

### 1. Abandonment

Parental rights may be terminated when "[a]bandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]" Tenn. Code Ann. § 36-1-113(g)(1). In turn, section 36-1-102(1)(A) defines abandonment in multiple ways, two of which are at issue in this appeal. First, abandonment is defined as, inter alia,

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended or supplemental pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i).[8] The relevant period in this case is February 15, 2023, through June 14, 2023. Here, the proof at trial was undisputed that Father never made any support payments for the child during the entirety of the custodial period. And while Father did provide some gifts for the child, these gifts were given outside the relevant four-month period. Father did not argue in the trial court that he was unable to pay support. *See generally* Tenn. Code Ann. § 36-1-102(1)(I) (making the lack of willfulness an affirmative

---

[8] Throughout this Opinion, we apply the version of the relevant statutes that were in effect at the time the petition was filed.

defense that the parent has the burden to raise and prove). As a result, clear and convincing evidence was presented to support this ground for termination.

Abandonment is also defined as, inter alia,

*(a)* The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
*(b)* The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
*(c)* For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

The record establishes that the child was removed from Father's legal custody by an order in the dependency and neglect proceeding and placed in DCS custody. Moreover, the proof was essentially undisputed that Father had not established a suitable home in either the four months following the removal or at any time prior to the termination proceeding. The trial court further found that DCS made reasonable efforts to help Father secure housing, but that Father did not match these efforts. We agree. The proof shows that in the months following the removal, Ms. McCullah reached out to Mother and Father and offered them various resources aimed at helping them to obtain housing and employment. Ms. McCullah also provided other support, including supervising visitation, setting up parenting classes, enrolling Father in the STOP program, and attempting to perform random drug screenings on Father. In response, Father did regularly participate in visitation, but did not complete the STOP program and did not regularly submit to drug

screens. Even more importantly, while Father moved a few times during the custodial period, none of the homes were ever suitable. Father's lack of effort to secure stable housing and employment indicates a lack of concern, such that it appears unlikely that he will be able to provide a suitable home at an early date. As such, this ground for termination is affirmed.

## 2. Persistence of Conditions

The trial court also terminated Father's parental rights on the ground of persistence of conditions under Tennessee Code Annotated section 36-1-113(g)(3):

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Here, there is no dispute that the child was removed from Father's legal custody by an order in a dependency and neglect proceeding more than six months prior to the termination trial. Moreover, the evidence demonstrates that the conditions that led to the child's removal, namely the lack of safe and stable housing provided by her parents, still persisted even at the time of the termination trial. Given how little progress Father made in remedying these conditions, there is little likelihood that Father will remedy them in the near future. And the continuation of Father's relationship with the child prevents her integration into a more permanent home. *Cf.* ***In re Allison S.***, No. E2023-01072-COA-R3-PT, 2024 WL 2050502, at *10 (Tenn. Ct. App. May 8, 2024) (finding that continuing mother's relationship with the child would diminish the child's chances of early integration into a safe, stable, and permanent home when the child "made great progress in her development and received necessary therapies and educational interventions" even though she was not in a pre-adoptive foster home). So the trial court did not err in finding clear

and convincing evidence of this ground for termination.

### 4. Failure to Manifest an Ability and Willingness to Parent

The trial court also determined that Father failed to manifest an ability and willingness to assume custody or financial responsibility of the child under Tennessee Code Annotated section 36-1-113(g)(14). Parental rights may be terminated where:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). The ground contains two distinct elements that must be proven by clear and convincing evidence. The first requires proof that the parent has failed to evince **either** an ability **or** a willingness to assume custody of the child. ***In re Neveah M.***, 614 S.W.3d 659, 677 (Tenn. 2020). The second element requires proof that placing the child in the parent's custody poses "a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14).

Here, Father has not demonstrated the ability or willingness to take either physical custody or financial responsibility for his child. Obviously, Father's lack of suitable housing and his lack of effort to obtain suitable housing indicate that he is both unable and unwilling to make the effort required to take physical custody of the child. Moreover, Father's lack of effort to obtain employment, despite no known barriers to doing so, and complete failure to pay financial support for the child, indicates that he is both unable and unwilling to take financial responsibility for the child.

Additionally, the evidence was sufficient to establish the second element: placing the child in Father's physical and legal custody would create a significant risk of harm. Here, Father's current home is not safe for a child. The camper was very small, cluttered, and lacked both running water and electricity. And this type of dwelling was not an anomaly in Father's life; Father had previously lived in a home much the same. Such an environment poses a significant risk of harm to the child. As such, the trial court did not err in finding sufficient evidence of this ground for termination.

### B. Best Interest

Because we have determined that at least one statutory ground has been proven for terminating Father's parental rights, we must now decide if DCS has proven, by clear and convincing evidence, that termination of Father's rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); ***White v. Moody***, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994).

In determining the best interest of a child, the court "shall consider all relevant and child-centered factors applicable to a particular case before the court." Tenn. Code Ann. § 36-1-113(i)(1). The factors "may include, but are not limited to":

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe

- 10 -

and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1). "All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order." Tenn. Code Ann. § 36-1-113(i)(3).

We look first to the factors related to stability and the child's attachments. *See* Tenn. Code Ann. § 36-1-113(i)(A) (involving the effect of termination on the child's need for stability), (B) (involving the effect of a change in caretakers on the child's wellbeing), (C) (involving whether the parent has demonstrated continuity and stability), (H) (involving the child's attachment to another parent-figure). The trial court found that each of these factors weighed in favor of termination. Father disputes factors (A), (B), and (C) on appeal, so we will consider each in turn.

As to factor (A), Father argues that this factor does not weigh in favor of termination because the evidence shows that he has a close, ongoing relationship with the child and the child is not in a pre-adoptive home. Respectfully, we disagree. It is true that Father has been able to maintain a loving relationship with the child and the child is not in a pre-adoptive home. Indeed, many of Father's arguments on appeal rest on the fact that foster family is not at this time pre-adoptive. But this Court has held that even when the child has not been placed in a pre-adoptive home, "the trial court is not required to delay the possibility that the child[] could be integrated into safe, stable, and permanent home on the off chance that [the parent] will finally make improvements in [his or] her life." ***In re Briana H.***, No. M2017-02296-COA-R3-PT, 2018 WL 4191227, at *12 (Tenn. Ct. App. Aug. 31, 2018). Throughout the pendency of this matter, Father has not shown that he is in any way capable of actually caring for a child by providing stable housing or income.

- 11 -

Although the foster family may not be pre-adoptive, they have done what Father could not: provide the child with stability and continuity. And while the evidence on this issue was scant, Father does not dispute the trial court's finding that the child has formed a healthy attachment to her foster family; the proof on this issue shows that she is thriving in their care. So, while a pre-adoptive home may be the ideal situation, we will not let perfect be the enemy of good in this case. Factors (A) and (H) therefore favor termination.

As to factor (B), the trial court cited the bond between the child and her foster family, as well as the improvements in the child's development. On appeal, Father argues that although the child has made progress in the foster home, there is no evidence the child would not have made such progress in his care. We disagree. Here, Father has repeatedly failed to complete required and recommended programs. He has never demonstrated a pattern of stable employment or any transportation plan. He has never demonstrated the ability to maintain a safe and stable home for the child. If Father cannot meet his own needs, we have little faith that he will be capable of meeting the child's medical and mental health needs. Indeed, the proof shows that the child's progress is the result of two types of therapy, at least one of which the foster family has to transport her to. Without any stable transportation, we have little confidence that Father would be able to maintain the child's therapeutic needs. And if Father cannot meet these needs, the child's progress will likely be diminished. These facts therefore lead us to agree that this factor also favors termination.

As to factor (C), Father concedes that he is "without proper housing" but argues that his care of the child prior to the removal should be considered. Here, Father was not parenting the child at the time of the removal, and there is little evidence of how involved he was in the day-to-day care of the child prior to that time. Moreover, at the time of the removal, the child's speech was so delayed that she communicated in grunts. With proper therapy, the child has made significant progress. Thus, the evidence demonstrates that not only was Father not able to offer the child stability and continuity at the time of the termination hearing, there is considerable doubt that he ever did. Thus, factors (A), (B), (C), and (H) favor termination.

The trial court did not find that factors (D), (E), (F), (G), (I), (N) or (T) weighed in favor of termination. *See* Tenn. Code Ann. § 36-1-113(i)(D) (involving the security of the parent-child attachment), (E) (involving visitation), (F) (involving the child's fear of the parent's home), (G) (whether the parent or his home will trigger the child's trauma), (I) (involving the child's significant relationships with others, including siblings), (N) (involving any abuse or neglect present in the parent's home), (T) (involving the effect of the parent's mental and emotional fitness on the child). DCS does not dispute that these factors do not weigh in favor of termination.[9] It is true that Father has a good relationship

---

[9] As to some of these factors, the trial court ruled that it would not make a ruling because no proof was presented as to a factor. However, a lack of proof as to an issue most often means that the factor does not favor termination. *See, e.g.*, **In re Cartier H.**, No. M2022-01576-COA-R3-PT, 2023 WL 7158076, at

with the child and that there is no evidence that he has ever done anything to make the child fearful of him. Moreover, there was no evidence that Father has any mental health concerns, and his mental health assessment recommended no treatment. As such, these factors do indeed weigh against termination.

We next consider whether Father has made a lasting adjustment of circumstances and can meet the child's needs. *See* Tenn. Code Ann. § 36-1-113(i) (J) (whether the parent has made a lasting adjustment of circumstances such that it would be safe for the child to return to his home), (K) (whether the parent has taken advantage of available programs and resources to assist in making a lasting adjustment of circumstances), (L) (involving whether DCS made reasonable efforts to assist the parent); (M) (involving the parent's sense of urgency), (O) (involving whether the parent has provided safe stable care to other children), (P) (involving the parent's understanding of the child's basic needs), (Q) (involving the parent's commitment to having a home that meets the child's needs), (R) (involving the health and safety of the home), (S) (involving the parent's consistent payment of more than token child support). The trial court generally found that these factors favored termination. We agree.

Here, the proof shows that Father's living situation is no better than when the child and her sibling were removed. Throughout the pendency of this case, one thing is certain: Father does not have proper housing for his child that is safe, clean, and stable. While both DCS workers testified to the resources that they provided to Father, there was no testimony of any kind that Father made even minimal efforts in return.[10] Father also lacks transportation and income and has demonstrated no sense of urgency in remedying these issues for the entirety of the time the child has been in DCS custody. A reliable means of transportation is particularly important for this child because she has special needs that require consistent care and appointments that are necessary for her to thrive. And despite the trial court's finding that Father had no barriers to employment, he made no effort to provide financial support for the child. These factors therefore heavily favor termination.

In sum, the clear majority of the factors in this case favor termination. It is true that Father has maintained a relationship with the child through regular ZOOM visitations. Father is always appropriate during visitation, and the child is clearly bonded to Father. But these factors simply do not outweigh the fact that Father cannot now, and has

---

*14 (Tenn. Ct. App. Oct. 31, 2023) (explaining that the "failure to submit sufficient proof as to a factor does not necessarily mean that the factor is inapplicable").

[10] The trial court's findings on this issue are somewhat inconsistent. First the trial court found that while Father's "lack of housing was the crux of this case," because "the Court knows of no housing programs . . . the Court will not make a ruling as to this factor." The trial court went on, however, to find that Father failed to make a lasting adjustment of circumstances despite the efforts of DCS. Moreover, as previously discussed, the trial court found that DCS made reasonable efforts in connection with the abandonment by failure to establish a suitable home ground. After our independent review of the record, we conclude that DCS met its burden to make reasonable efforts.

apparently made little effort to ever, provide a safe, stable home for the child. Father's situation likely cannot meet the needs of any child, much less a child with the specific needs that are present in this case. Thus, while the child is not in a pre-adoptive home, she has a much better chance of achieving permanency and stability outside of Father's care than in it. As a result, we conclude that the trial court did not err in finding clear and convincing evidence that termination of Father's parental rights is in the child's best interest.

## IV. CONCLUSION

The judgment of the Campbell County Juvenile Court is affirmed, and this cause is remanded for further proceedings as may be necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant, Willie D., for which execution may issue if necessary.


s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE