IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
November 5, 2008 Session

# IN THE MATTER OF M.L.P.

**Appeal by Permission from the Court of Appeals**
**Juvenile Court for Shelby County**
**No. P9221      Herbert J. Lane, Referee**

_____

**No. W2007-01278-SC-R11-PT - Filed March 27, 2009**

_____

This appeal involves an action to terminate the father's parental rights filed jointly by the prospective adoptive parents and the temporary guardians of the child. The Juvenile Court found that the father did not abandon his child because the child's temporary guardian interfered with the father's attempts to visit the child. The Court of Appeals reversed, concluding that the father abandoned the child pursuant to Tennessee Code Annotated section 36-1-102(1)(A)(i) by willfully failing to visit the child for over four months. We affirm the judgment of the Court of Appeals. The case is remanded to the juvenile court to determine whether termination of the father's parental rights is in the best interests of the child.

**Tenn. R. App. P. 11; Judgment of the Court of Appeals is Affirmed;**
**Case Remanded to Juvenile Court**

JANICE M. HOLDER, C.J., delivered the opinion of the court, in which CORNELIA A. CLARK, GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Arthur C. Walton, Memphis, Tennessee, for the appellant, M.G.P.

James F. Arthur, Memphis, Tennessee, for the appellees, Great Aunt and Great Uncle.

Kevin W. Weaver, Cordova, Tennessee, for the appellees, Petitioners.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Amy T. McConnell, Assistant Attorney General, for the appellee-intervenor, State of Tennessee.

**OPINION**

Facts and Procedural History

On July 7, 2001, Mother gave birth to M.L.P. in Memphis, Tennessee. Mother and Father were not married, and M.L.P.'s birth certificate did not identify Father. Both parents were twenty years old at the time of M.L.P.'s birth.

M.L.P. and his parents lived with the maternal grandmother ("Grandmother") for several months until they found housing. Approximately one year later, Mother and M.L.P. returned to Grandmother's home for a three-month period. Father did not visit M.L.P. during this time.

In March 2003, Mother and Father reunited, and M.L.P. began living with Grandmother. During the nearly eight months that Grandmother had sole physical custody of M.L.P., Father did not visit or contact M.L.P. by telephone. M.L.P. resumed living with Mother in November 2003. The testimony is unclear as to whether Father lived with Mother and M.L.P. in November and December 2003.

In January 2004, M.L.P. resumed living with Grandmother while her sister ("Great Aunt") provided care for M.L.P. during the day. On February 1, 2004, Mother called Great Aunt and asked her to take responsibility for the care of M.L.P. while Mother found a house and a job. Great Aunt and her husband ("Great Uncle") agreed.

Also in February 2004, Father asked Great Aunt if he could visit M.L.P. The trial court made no findings of fact concerning the number of requests made by Father. Father asserts that he telephoned six to eight times requesting to visit M.L.P. Great Aunt, however, testified to two telephone calls requesting visitation and one call for advice regarding Father's relationship with Mother. Great Aunt testified that she responded to Father's requests to visit M.L.P., "I don't think it's a good idea right now." Great Aunt testified that M.L.P. was terrified of being left alone in a room and was too traumatized to see Father. Father responded to Great Aunt that he would take her to court, to which Great Aunt responded, "Please do." Great Aunt testified that during one of Father's telephone calls she asked him to bring some of M.L.P.'s toys to him but that Father never did so. Father testified that Great Aunt permitted him to speak briefly with M.L.P. on one or two occasions.

On March 10, 2004, Father executed a voluntary acknowledgment of paternity with respect to M.L.P., and Father and Mother applied for a new birth certificate. Father testified that he took this action "[b]ecause if I was on the birth certificate, I would have went [sic] and picked up my child up from her house and there would have been nothing that could have stopped me." A new birth certificate was issued on May 4, 2004.

On May 10, 2004, Great Aunt and Great Uncle filed a petition in juvenile court seeking temporary custody of M.L.P., asserting that M.L.P. was dependent and neglected. The court entered

a protective custody order granting temporary custody to Great Aunt and Great Uncle pending a hearing. Father accompanied Mother to the hearing but did not testify or address the court. Father later testified that he was there to tell Mother that "she is legally the mother of that child and there's no one that can stop her, by law, from taking that child back from her aunt." When Father was asked why he did not also believe himself to be the legal father at this time, he replied, "I don't have an answer for that."

On May 12, 2004, the juvenile court held a preliminary hearing on the petition and directed Mother to take a drug test. Mother failed the court-ordered drug test, and the juvenile court granted temporary custody and guardianship to Great Aunt and Great Uncle. Father was not present at this hearing. Great Aunt testified that Father was not notified of these hearings because his name did not appear on the birth certificate[1] and that she had not seen or heard from him in about three months.

On July 16, 2004, the juvenile court held another hearing on the petition. The court granted Mother liberal visitation but ordered her to undergo drug counseling. Father, who had been notified of the hearing and was present, did not seek custody or visitation privileges. When Father was asked at the termination hearing why he did not assert any rights or claims with respect to M.L.P. during the July 16 hearing, he replied, "I don't have a very good reason for that." Father left the July 16 hearing at the noon recess because he found out Mother had married. Additional hearings were conducted on December 3, 2004, and January 28, 2005.

On March 30, 2005, the juvenile court entered a final order granting custody of M.L.P. to Great Aunt and Great Uncle due to dependency and neglect. By this time, Mother was no longer visiting M.L.P. but made occasional phone calls. Mother was present at the hearing and was arrested after the hearing on an outstanding warrant.

During the summer of 2005, Great Aunt decided to seek a termination of parental rights. Friends of Great Aunt ("Petitioners"), whom Great Aunt had known for two years, offered to adopt M.L.P. The two families and their daughters enjoyed basketball and other activities in which they jointly participated. M.L.P. stayed overnight with Petitioners and played with their daughters.

On August 16, 2005, Petitioners, joined by Great Aunt and Great Uncle, filed a Petition for Termination of Parental Rights naming both Mother and Father as respondents. The joint petition alleged that the parents had abandoned M.L.P. by willfully failing to visit or support M.L.P. for more than four consecutive months within the meaning of Tennessee Code Annotated sections 36-1-102(1)(A)(i) and -113(g)(1) (2005 & Supp. 2008). Pursuant to Tennessee Code Annotated section 36-1-113(g)(3)(A), the petition also alleged that M.L.P. had been removed from the parents' home by court order for more than six months, that persistent conditions of abuse or neglect could not be remedied, and that continuation of the parent-child relationship diminished M.L.P.'s chances

---

[1] According to the record, Father's name was on the re-issued birth certificate at this time. There is no explanation in the record for Great Aunt's misstatement.

-3-

of a safe, stable, and permanent home. Finally, the petition asserted that termination would be in the best interests of M.L.P.

At the time of the petition, Great Aunt had not seen or heard from Father since the July 16, 2004, hearing, a period of thirteen months. Father had not visited or spoken with M.L.P. since February 2004, a period of nearly eighteen months.

The juvenile court appointed a guardian ad litem on September 21, 2005. On November 14, 2005, Mother executed a voluntary surrender of her parental rights. Mother surrendered M.L.P. to Petitioners, who signed an acceptance of surrender as prospective adoptive parents.

On April 26, 2007, the juvenile court heard testimony and argument on the petition to terminate Father's parental rights. Father argued that his failure to visit was due to his instability and Great Aunt's efforts to prevent him from visiting M.L.P. Father testified that he was now stable and wanted custody of M.L.P. When Father was asked why he did not attempt to establish visitation between the July 16, 2004, hearing and the August 16, 2005, petition to terminate parental rights, he replied, "I don't really have a good answer for that. I don't really know the right path to take action sometimes on stuff like that."

On May 2, 2007, the juvenile court entered an order dismissing the petition as to Father, finding that Father did not abandon M.L.P. by willfully failing to visit him because Great Aunt frustrated Father's attempts to visit M.L.P. In addition, the juvenile court found that Father did not abandon M.L.P. by willfully failing to support him because Great Aunt never sought child support. The court did not address the additional ground of persistent conditions of abuse or neglect or whether termination of Father's parental rights was in M.L.P.'s best interests.

A majority of the Court of Appeals reversed, holding that there was clear and convincing evidence that Father's actions constituted abandonment of M.L.P. pursuant to Tennessee Code Annotated sections 36-1-102(1)(A)(I) and -113(g)(1) and remanded for a determination of whether termination of Father's parental rights was in M.L.P.'s best interests. We granted Father's application for permission to appeal.

Analysis

Standing

The Court of Appeals determined sua sponte that Great Aunt and Great Uncle lacked standing to file a petition for termination of parental rights pursuant to Tennessee Code Annotated section 36-1-113(b).[2] Great Aunt and Great Uncle admit that they do not fall within the exclusive

_____

[2] Tennessee Code Annotated section 36-1-113(b) states:

list of persons or entities listed under section 36-1-113(b) who have standing to file a petition to terminate parental rights. Rather, Great Aunt and Great Uncle argue that, as the temporary guardians of M.L.P., they must be joined as a party under Tennessee Code Annotated section 36-1-117(a)(1) (2005).[3]

> Section 36-1-117(a)(1) states in pertinent part:

> Unless the parent, the legal parent, or the guardian, or, as provided in subsections (b) and (c), the putative biological father of the child has surrendered parental *or guardianship rights* to the child, has executed a parental consent that has been confirmed by the court, has waived such person's rights pursuant to § 36-1-111(w), or unless such person's rights have been terminated by the order of a court of competent jurisdiction, the legal parent(s), guardian of the person of the child or of an adult, and the biological parents of the child must be made parties to the adoption proceeding or to a separate proceeding seeking the termination of *those rights*, and *their rights to the child* must be terminated by a court to authorize the court to order the adoption of the child or adult by other persons.

(emphasis added).

Ignoring the language not relevant to the status of Great Aunt and Great Uncle as legal guardians of M.L.P., the statute would read: Unless the guardian has surrendered guardianship rights to the child, the guardian of the person of the child must be made [a] part[y] to the adoption proceeding or to a separate proceeding seeking the termination of those rights, and their rights to the child must be terminated by a court to authorize the court to order the adoption of the child by other persons. Thus, a plain reading of this statute indicates that the legal guardians of a child must be joined as parties when *their rights to the child* are being terminated. In this case, Father's rights are at issue, not the rights of the guardians. Section 36-1-117 therefore does not apply to this case.

Because Petitioners have standing under section 36-1-113(b) as prospective adoptive parents, the juvenile court had jurisdiction to hear the petition. The lack of standing of Great Aunt and Great Uncle does not affect our decision today or the ultimate outcome of this case.

---

[2](...continued)
The prospective adoptive parent or parents, including extended family members caring for a related child, any licensed child-placing agency having custody of the child, the child's guardian ad litem, or the department shall have standing to file a petition pursuant to this part or title 37 to terminate parental or guardianship rights of a person alleged to be a parent or guardian of the child. The prospective adoptive parents, including extended family members caring for a related child, shall have standing to request termination of parental or guardianship rights in the adoption petition filed by them pursuant to this part.

[3] Tennessee Code Annotated section 36-1-117 was amended in 2008 but remains substantially the same as the pre-amended section. We cite to the 2005 language, which was in effect at the time the petition was filed.

Termination of Parental Rights

A party seeking termination of parental rights must prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c). First, the party must prove one of the statutory grounds for termination enumerated in Tennessee Code Annotated section 36-1-113(g). Id.; In re F.R.R., III, 193 S.W.3d 528, 530 (Tenn. 2006). Second, the party must show that termination is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c)(2); In re Valentine, 79 S.W.3d 539, 546 (Tenn. 2002).

The petition in this case alleged two grounds for the termination of Father's parental rights: abandonment and persistence of conditions. See Tenn. Code Ann. § 36-1-113(g)(1) & (3). Abandonment is defined in Tennessee Code Annotated section 36-1-102(1)(A)(i), in pertinent part, as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Section 36-1-102(1)(E) further provides, "'willfully failed to visit' means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." "Token visitation" is defined in section 36-1-102(1)(C) as visitation that "constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimum or insubstantial contact with the child."

To constitute abandonment, the failure to visit must be willful. We have held that when a parent attempts to visit his child but is "thwarted by the acts of others," the failure to visit is not willful. In re Adoption of A.M.H., 215 S.W.3d 793, 810 (Tenn. 2007); see In re F.R.R., III, 193 S.W.3d at 530. Thus, a parent's failure to visit is willful when it is "the product of free will, rather than coercion." In re Audrey S., 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005).

Father argues that he was not aware of his duty to visit M.L.P. or the consequences of his failure to visit. We decline to hold that a parent must be aware of the consequences of his failure to visit for such a failure to be willful. The plain language of the statute requires that the failure to visit be "willful," not that the parent be fully apprised of every consequence the failure to visit might produce. Persons are presumed to know the law, see Wallace v. Nat'l Bank of Commerce, 938 S.W.2d 684, 686 (Tenn. 1996); Bd. of Educ. v. Shelby County, 339 S.W.2d 569, 584 (Tenn. 1960), and parents should know that they have a responsibility to visit their children.

Father argues that Great Aunt's interference with his attempts to contact M.L.P. precludes a finding that he willfully failed to visit M.L.P. A parent's failure to visit may be excused by the acts

of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child. In re Audrey S., 182 S.W.3d at 864.

We review the trial court's findings of fact de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); In re A.M.H., 215 S.W.3d at 809. In lieu of specific findings of fact concerning the issue of abandonment, the juvenile court concluded that Father did not abandon M.L.P. because Great Aunt frustrated Father's attempts to visit M.L.P.[4] We review "the trial court's ruling that the facts of [a] case sufficiently support the termination ground of willful abandonment," a conclusion of law, de novo with no presumption of correctness. Id. at 810.

Father testified that he telephoned Great Aunt six to eight times. Great Aunt's response to Father's request to visit M.L.P. was "I don't think it's a good idea right now." While Father's early attempts to visit M.L.P. in February 2004 may have been discouraged by Great Aunt, Father did not make any attempt to contact or visit M.L.P. for more than one year prior to the petition to terminate his parental rights.

Moreover, the record is clear that the last action Father took with respect to M.L.P. was to establish paternity in March 2004. Unlike the parents in In re A.M.H., who "actively pursued legal proceedings to regain custody" of their child, id., Father did not take further court action to request custody or visitation after the new birth certificate was issued on May 4, 2004. Further, he admitted that he had no good reason for his failure to do so. Father's own testimony indicates his familiarity with his parental rights. Father testified that he executed a voluntary acknowledgment of paternity "[b]ecause if I was on the birth certificate, I would have went [sic] and picked up my child up from her house and there would have been nothing that could have stopped me." In addition, he told Mother that she had the same right to take M.L.P. without Great Aunt's permission. Father had no explanation, however, for his failure to take legal action or to request informal visitation from Great Aunt after he established paternity. We therefore conclude that there is clear and convincing evidence that establishes Father's abandonment of M.L.P. by willful failure to visit.

Because we conclude that there is a statutory ground for terminating Father's parental rights, we need not consider Father's failure to support or the remaining alleged statutory ground for termination. We remand to the trial court for a determination of whether termination is in the best interests of M.L.P.

---

[4] The juvenile court also expressed concern that Father was not an original party to the earlier petition for temporary custody based on dependency and neglect and that there was no showing that M.L.P. would suffer substantial harm if placed in Father's custody.

Constitutional Challenge to Tenn. Code Ann. § 37-2-403

On May 1, 2007, the parties reconvened to hear the juvenile court announce its ruling. Before the court announced its ruling, Father asserted that his constitutional rights to due process and equal protection had been violated because no one had informed him that the failure to visit or support M.L.P. for over four months could be grounds for terminating his parental rights. Specifically, Father argued that Tennessee Code Annotated section 37-2-403 (2005 & Supp. 2008), which requires the Tennessee Department of Children's Services to notify parents of this ground for termination when a child is in the custody of a state agency such as DCS, is unconstitutional because it should also apply to private termination proceedings. The court did not rule on Father's constitutional challenge, and Father failed to notify the Tennessee Attorney General of his challenge in accordance with Tennessee Code Annotated section 29-14-107(b) (2000) and Tennessee Rule of Civil Procedure 24.04, which require that the attorney general be notified when a party alleges that a statute is unconstitutional.

We have stated that "[a] conclusory contention that a statute is unconstitutional, raised for the first time in closing argument . . . does not present an attractive issue for appellate review." In re Adoption of E.N.R., 42 S.W.3d 26, 31 (Tenn. 2001). In addition, Father's challenge was "late-raised [and] minimally addressed." Id. at 32. Because Father did not properly raise this issue in the trial court, he has waived his right to argue this issue for the first time on appeal. See In re F.R.R., III, 193 S.W.3d at 531.

Conclusion

We conclude that Father's abandonment of M.L.P. is supported by clear and convincing evidence that Father willfully failed to visit. We therefore need not consider whether Father abandoned M.L.P. by failure to support or whether other statutory grounds for termination exist. Further, we decline to consider Father's constitutional argument because Father did not properly raise the issue in the trial court. The judgment of the trial court is reversed, and the case is remanded for a determination of whether termination of Father's parental rights is in the best interests of M.L.P. The costs of this appeal are taxed to Father, and his surety, for which execution may issue if necessary.

_____
JANICE M. HOLDER, CHIEF JUSTICE