IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 21, 2025 Session

**IN RE LUCAS S.**

**Appeal from the Circuit Court for Montgomery County**
**No. CC-2023-CV-167     Kathryn Wall Olita, Judge**

————————————————————

**No. M2024-00611-COA-R3-PT**

————————————————————

This is a termination of parental rights appeal. The father appeals the judgment of the trial court that terminated his parental rights to his minor child based on abandonment by willful failure to visit. The trial court further concluded that termination was in the child's best interests. Discerning no error, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

VALERIE L. SMITH, J., delivered the opinion of the court, in which KENNY W. ARMSTRONG and CARMA DENNIS MCGEE, JJ., joined.

Anthony W. Kirby, Clarksville, Tennessee, for the appellant, Zacory S.

Stacy A. Turner, Clarksville, Tennessee, for the appellees, Samuel B. and Shenette G.

**OPINION**

**I.     BACKGROUND & PROCEDURAL HISTORY**

Lucas S. ("the Child") was born in July of 2016 to Zacory S. ("Father") and Shenette G. ("Mother"). Father and Mother were never married and their romantic involvement in the Fall of 2015 was brief. Shortly after Mother discovered she was pregnant, she resumed her relationship with Samuel B. ("Stepfather"), whom she later married. Father and Stepfather were both present for the Child's birth. Following the Child's birth, Mother and Father engaged in an informal co-parenting arrangement. Father exercised visitation at Mother's home or workplace largely at Mother's discretion. During the Child's infancy, Mother was breastfeeding and had a low milk supply, so Mother and Father agreed that overnight visits between Father and the Child would not occur at that time.

In October of 2016, the Juvenile Court of Montgomery County entered a Permanent Parenting Plan ("the 2016 Parenting Plan") designating Mother as the primary residential parent. The 2016 Parenting Plan outlined an increase in visitation for Father, including overnight visits, but began with Father having zero days of visitation. It is undisputed that Mother and Father entered into the 2016 Parenting Plan because Mother needed to include child support in her income in order to qualify for a mortgage. At trial, Mother and Father agreed that they have never followed the visitation schedule set forth in the 2016 Parenting Plan.

Father is an active duty servicemember whose duties require frequent relocation and extended travel. At trial, Father testified that he was deployed from October of 2017 until April of 2018 in a remote area, and that he was unable to effectively communicate with Mother or the Child. It is undisputed that he never called or emailed Mother during this deployment. Visitations resumed in October of 2018, at which time Father exercised daytime visits with the Child approximately every other week until April of 2019.

In May of 2019, Father began Army Flight School and was required to relocate to Daleville, Alabama until September of 2020. The design of the program rendered consistent contact between Father and the Child difficult. While enrolled in the program, Father had approximately three daytime visitations with the Child. After Father graduated from flight school, he received orders to report to Colorado Springs, Colorado. Communication became less frequent between Father and the Child after Father's move to Colorado.

In July of 2021, Mother suggested that Father join Mother and the Child for a beach trip to Florida. Father fell ill and missed two days of the trip. After effort by both Mother and Father, Father was able to spend about an hour with the Child at the beach. Father changed his return flight home to accommodate the visitation.

In November of 2021, Father traveled from Colorado to Tennessee to see the Child again in Clarksville, Tennessee. Father testified that this trip to Tennessee to visit with the Child went well, and they enjoyed a variety of activities including a hike, museum visit, and bowling. Thereafter, Mother and Father attempted to schedule a visit to Colorado in December of 2021. As Father could not leave Colorado due to his military service duties, Mother planned to fly with the Child to visit Father. The record indicates that Mother and the Child did not fly to Colorado in December because Mother decided that the trip was cost prohibitive. Father was disappointed and testified that he felt "defeated." Father further testified that "[i]t felt like I was getting really close to finally being able to do something like that, and then . . . I hate to say it got ripped away because that's not the best way to say it, but that's . . . sort of the way it made me feel."

It is undisputed that Father did not communicate with Mother or the Child until seven months after the failed attempt to visit in Colorado in December of 2021. In July of

2022, Father sent one text message to Mother that said, "[h]ey, sorry it's been a while but I was hoping to talk to [the Child] this week. We can talk too so I can sort of explain what's been going on." Mother testified that she needed a day to process the message but ultimately did not respond to Father. Father made no attempts to follow up before the filing of the termination petition.

The record indicates that, with the exception of the 2016 Parenting Plan, Father has never sought assistance from any court regarding visitation or custody. Father testified that he does not have faith in the judicial system, and he did not believe any court action would end in his favor. Father testified that Mother did not thwart his efforts to visit the Child. Father did not send the Child letters, cards, or gifts for Christmas or his birthday from ages four through seven.

Mother and Stepfather filed the Petition for Adoption and Termination of Parental Rights on January 23, 2023, alleging that Father abandoned the Child by failing to visit and that termination of Father's parental rights would be in the Child's best interest. At that time, Father had not seen the Child in more than one year. On October 5, 2023, the trial court initially permitted telephonic visitation between Father and the Child; however, visitation was suspended in November of 2023 following a motion by the Guardian *ad Litem*. The trial court denied Father's motion to reinstate visitation filed in December of 2023. The final hearing was set for December 11, 2023, but was postponed to March of 2024 due to a tornado that closed the Montgomery County Courthouse. At the final hearing, Father acknowledged that he was capable of visiting the Child and his visitation efforts had not been thwarted by Mother. On March 26, 2024, the trial court entered an order terminating Father's parental rights finding that Father abandoned the Child based upon his failure to visit and that termination was in the Child's best interest. Father timely filed a Notice of Appeal in this Court on April 24, 2024.

## II.    ISSUES PRESENTED[1]

Father presents the following issues for review on appeal, which we have rephrased slightly:

1. Whether the trial court erred in limiting Father's visitation, including telephonic visitation, with the Child during the pendency of the termination.
2. Whether the trial court erred by subsequently suspending Father's visitation with the Child.
3. Whether the trial court erred in finding, by clear and convincing evidence, that

---

1.    The first issue raised by Father in his briefs was "[w]hether the trial court erred by failing to dismiss the termination proceeding pursuant to Tennessee Code Annotated § 36-1-11(d) for not concluding within one year of filing." While the parties briefed this issue, counsel for Father waived this issue during oral argument, acknowledging that he had simply forgotten that an EF-3 tornado struck the Montgomery County Courthouse at that time. Given the waiver of counsel, we see no need to delve further into this issue.

Father abandoned the Child by willful failure to visit pursuant to Tennessee Code Annotated section 36-1-113(g)(1).

4. Whether the trial court erred in finding, by clear and convincing evidence, that termination of Father's parental rights was in the best interest of the Child.

## III.  STANDARD OF REVIEW

"Parents have a fundamental constitutional interest in the care and custody of their children," which is guaranteed under both the United States and Tennessee constitutions. *In re Connor B*., 603 S.W.3d 733, 788 (Tenn. Ct. App. 2020) (quoting *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2022)). This right is not absolute, however, and may be terminated if a court finds that one of the statutory grounds for termination exists and that termination is in the child's best interest. *See* Tenn. Code Ann. § 36-1-113(c); *Santosky v. Kramer*, 455 U.S. 745 (1982); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). Statutory grounds for termination and a determination that termination is in the child's best interest must all be found by clear and convincing evidence, which "serves to prevent the unwarranted termination or interference with the biological parents' rights to their children." *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts . . . and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted).

In cases involving the termination of parental rights, the standard of appellate review differs slightly from general appellate review under Rule 13 of the Tennessee Rules of Appellate Procedure. The Tennessee Supreme Court has explained this heightened form of review as follows:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

> Second, appellate courts determine whether the combination of all of the

individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [Tenn. 2010].

*In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023). "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See Bernard T.*, 319 S.W.3d at 596. Because of the nature of the consequences, proceedings to terminate parental rights require an individualized determination. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

## IV.    ANALYSIS

### 1.  *Limitation of Visitation*

Father first asserts the trial court erred in limiting his parenting time during the pendency of the termination and adoption proceeding. The trial court limited visitation finding that the 2016 Parenting Plan was not in the Child's best interest. He argues that the 2016 Parenting Plan entered in the juvenile court should have governed visitation throughout the pendency of the termination proceedings.

Generally, for a trial court to modify a parenting plan, there must be a material change in circumstances and a showing that modification serves a child's best interests. Tenn. Code Ann. § 36-6-101(a)(2)(C) ("If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest."). "Determining the details of parenting plans is 'peculiarly within the broad discretion of the trial judge.'" *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). Decisions regarding parenting plans are factually driven and require careful consideration of numerous factors. *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997). Thus, as the trial court has the opportunity to observe witnesses and make credibility determinations, it is better positioned to evaluate the facts governing a parenting plan than an appellate court. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007).

Once a petition for adoption is filed, the trial court presiding over the termination and adoption proceeding gains exclusive jurisdiction over all issues concerning custody, guardianship, and visitation of the child. Tenn. Code Ann. § 36-1-116(f)(1) ("Upon the filing of the [adoption] petition, the court shall have exclusive jurisdiction of all matters pertaining to the child . . . ."). "When the petition for adoption is filed, jurisdiction over all matters related to the child, other than those regarding delinquency, unruly or truant acts, transfers to the court where the adoption petition is filed." *In re Carlee A.*, No. W2020-01256-COA-R3-PT, 2022 WL 225640, at *12 (Tenn. Ct. App. Jan. 26, 2022) (citing Dawn Coppock, *Coppock on Tennessee Adoption Law* 43 (2017)). This "serves to prevent a court from acting on matters of a child subject to an adoption petition." *In re Samuel D.*, 536 S.W.3d 447, 456 (Tenn. Ct. App. 2016).

The trial court may modify, suspend, or terminate visitation where contact is found to be contrary to the child's well-being. *In re Tylon L.D.*, No. E2010-01744-COA-R3-PT, 2011 WL 1884634, at *12-13 (Tenn. Ct. App. May 18, 2011) (denying mother's motion for visitation during the pendency of the termination proceeding because the pending petition for adoption suspended all proceedings regarding visitation). Courts are especially cautious when deciding issues of visitation during termination proceedings as the child's psychological stability and need for consistency takes precedent. *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016) (citing *Lehman v. Lycoming Cnty. Children's Servs. Agency*, 458 U.S. 502, 513-14 (1982)).

During the trial court proceedings, it was undisputed that Mother and Father entered the 2016 Parenting Plan to provide Mother with the necessary documentation to secure a mortgage. The trial court noted that "[a]t the start of litigation, neither party had a recollection that the 2016 [Parenting Plan] existed. Mother contacted her mortgage lender from 2016 to obtain a copy. Father did not know he was legally entitled to visitation with [the Child] until the 2016 [Parenting Plan] was produced in conjunction with this litigation."

Father filed a motion for visitation on August 7, 2024—nearly seven months after Mother and Stepfather filed the termination petition. Our review of the record indicates that Father ultimately withdrew the motion due to the presence of the pre-existing 2016 Parenting Plan. The trial court emphasized Father's acknowledgment that it was not feasible to exercise the day-to-day visitation as stated in the 2016 Parenting Plan and Father's intentions were to pursue holiday visitation only. The trial court found that it was not in the Child's best interest for Father to exercise any in-person visitation, whether in Colorado or Tennessee, and allowed Father two telephonic communications with the Child per week.

Father argues on appeal that the trial court erred in limiting visitation because it shortened the time allotted to him under the 2016 Parenting Plan. Father further asserts that the trial court *sua sponte* modified the 2016 Parenting Plan. Father relies on *Freeman v.*

*Freeman*, 579 S.W.3d 1 (Tenn. 2018), to further this argument. However, *Freeman* did not involve a *sua sponte* modification; rather, father there first invoked the trial court's jurisdiction by filing a petition to modify the parenting plan. *Id.* at *5. Father's reliance on *Freeman* is misplaced. In *Freeman*, the court considered the consequences of a parent's failure to attach a proposed parenting plan to a petition to modify. The *Freeman* court ultimately found that while the trial court "lost the ability to exercise its authority" after rendering final judgment, father invoked the court's jurisdiction by filing the modification petition. *Id.* at *6. It is understood that courts may not modify parenting plans *sua sponte*. *Hodge v. Hodge*, No. M2006-01742-COA-R3-CV, 2007 WL 3202769, at *4 (Tenn. Ct. App., filed Oct. 31, 2007) (finding that the court did act *sua sponte* as it appointed a special master with authority to modify a parenting plan to preside over the matter after entry of a final order and without any pending motions).

In this case, the trial court did not act *sua sponte* when it limited Father's visitation. Father raised the issue of visitation with the trial court and then readily admitted that the 2016 Parenting Plan was not feasible due to the distance between Mother and Father. The evidence preponderates in favor of the trial court's determination that limiting Father's visitation was in the Child's best interest. We conclude that the trial court did not err in limiting Father's visitation to two telephonic communications per week; however, if the trial court erred, that error is harmless. Furthermore, Father has failed to explain how this issue impacts our review of the trial court's determination that he willfully failed to visit the Child for the relevant four months preceding the filing of the termination petition. Father is not entitled to relief on this basis.

### 2. *Suspension of Visitation*

Father also argues on appeal that the trial court erred in denying the motion to reinstate visitation in December of 2023. On October 5, 2023, the trial court found that telephonic visitation was the most appropriate considering the relationship and distance between Father and the Child. The trial court specifically noted that "the purpose of the phone calls is not to force lengthy communications, but instead is to establish consistency, even if such consistency amounts to communications of sixty (60) seconds." However, on October 17, 2023, the Guardian *ad Litem* filed a motion to cease phone calls citing concerns that the Child was exhibiting emotional distress, anxiety, and reluctance to speak with Father. This included behavioral regressions following the phone calls. The Guardian *ad Litem* supported this motion with observations, case notes, and input from Mother and Stepfather. Father asserts that his phone interactions with the Child were not detrimental to the Child's mental well-being. Nevertheless, the trial court determined that the previously ordered visitation was not in the Child's best interest. Similar to his argument in section 1 above, Father does not provide any statutory authority or case law regarding how this issue affects the four-month period preceding termination petition.

From our review of the record, the trial court acted within the exclusive jurisdiction

granted by Tennessee Code Annotated § 36-1-116(f)(2) to adjudicate matters pertaining to visitation. Father is not entitled to relief on this issue.

### 3. *Abandonment by Willful Failure to Visit*

Father does not contest the fact that he did not visit or contact the Child between September 22, 2022, through January 22, 2023, which was the four months preceding the filing of the termination Petition. Rather, Father contends that his failure to visit during the four-month statutory period was not willful. Father argues that his failure to visit was the result of discouragement stemming from prior visitation denials by Mother, as well as Mother's refusal to accommodate his needs.

Parental rights may be terminated for abandonment. Tenn. Code Ann. § 36-1-113(g)(1). Relevant to this case, the term "abandonment" includes:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

*Id.* § 36-1-102(1)(A)(i). Willfulness requires the capacity to visit, and the choice not to do so, without a justifiable excuse. *Audrey S.*, 182 S.W.3d at 864 (citing *In re M.J.B.*, 140 S.W.3d 643, 654 (2004)). Willfulness does not require malice or ill intent; rather, it exists when a parent is aware of the duty to visit and has the ability to do so but chooses not to. *Id.* at 864-65.

A failure to visit is willful when it stems from free will rather than coercion; however, when another party prevents visitation, the failure is not willful. *In re Bently E.*, 703 S.W.3d 298, 302 (Tenn. 2024); *In re M.L.P*, 281 S.W.3d 387, 387 (Tenn. 2009). In *M.L.P.*, father attempted to visit with his child early in the child's life but was told by the legal guardian that "I don't think it's a good idea right now." *Id.* at 393. Father's parental rights were subsequently terminated citing abandonment by willful failure to visit. *Id.* The Tennessee Supreme Court, in affirming the statutory basis in which to terminate the father's parental rights, stated that "Father had no explanation . . . for his failure to take legal action or to request informal visitation . . . after he established paternity." *Id.* The Court noted that the language of the statute does not require a parent to "be fully apprised of every consequence the failure to visit might produce." *Id.* at 392. "[P]arents should know that they have a responsibility to visit their children." *Id.*

The law distinguishes between a parent who abandons a child through a willful

failure to visit and a parent who is trying to maintain visitation. *Cf. In re Adoption of A.M.H.,* 215 S.W.3d 793, 810 (Tenn. 2007) (noting that although the parents did not visit during the four-month period, they were actively pursuing legal proceedings to regain custody); *In re Chelbie F.,* No. M2006-01889-COA-R3-PT, 2007 WL 1241252, at *6 (Tenn. Ct. App. Apr. 27, 2007) (recognizing that the father was actively pursuing a court order to establish visitation rights). Further, "[w]hen analyzing willfulness, courts have considered whether a parent who was allegedly denied visitation redirected their efforts to the courts in an attempt to secure visitation." *In re Heaven J.*, No. W2016-00782-COA-R3-PT, 2016 WL 7421381, at *5 (Tenn. Ct. App. Dec. 22, 2016).

The relevant four-month period in this case was September 22, 2022, through January 22, 2023. Father testified that he neither visited nor had any direct contact with the Child during this period. Although Father sent one text message on July 31, 2022—seven months after his last attempted visit—this text message was still nearly six months before Mother and Stepfather filed the termination petition. The trial court also noted that Father failed to follow up after the unanswered message and made no further efforts to reinitiate contact or assert his parental rights. At oral argument, Father's counsel conceded that before the petition was filed Father was out of the Child's life "for about a year."

Father argues that his lack of contact with the Child at certain points was due to emotional challenges and feelings of discouragement due to prior difficulties scheduling visits—not a willful failure to visit. However, the trial court concluded that such explanations did not rise to the level of a justifiable excuse. Citing Father's own admissions, the trial court noted that Father had thirty days of annual military leave, used a portion of these days for personal travel, and had "no problem" travelling to Tennessee. When asked during trial whether "it would be fair to say . . . that all of your attempts at contacting [the Child] were never thwarted, and [Mother] accommodated you as best she could," Father responded, "[t]o my knowledge, yes. That's correct." The trial court found that, "[t]here is no evidence Mother's conduct actually prevented him from visiting his son. Father's conduct in this instance was willful." The trial court's conclusion that the failure to visit was willful rather than inadvertent or unavoidable is supported by the record, the trial court's findings, and Father's own admissions.

We agree with the trial court's finding that the evidence clearly and convincingly showed that Father abandoned the Child by willfully failing to visit as set forth in Tennessee Code Annotated section 36-1-113(g)(1).

### 4. *Best Interests of the Child*

Finally, Father argues that the trial court erred in determining that termination is in the Child's best interest because Father has demonstrated a "consistent and willing ability to provide." We begin our analysis by noting that "the parental duty of visitation is separate and distinct from the parental duty of support." *In re Jacob A.C.H.*, No. M2012-01175-

COA-R3-PT, 2013 WL 175548, at *2 (Tenn. Ct. App. Jan. 16, 2013). Our analysis is as follows.

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *Audrey S.*, 182 S.W.3d at 877; *see also Carrington*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.") (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010)). Tennessee Code Annotated section 36-1-113(i) contains a nonexclusive list of best interest factors for a court to consider. The factors may include, but are not limited to:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

- 10 -

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be

detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1). "All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order." *Id.* § 36-1-113(i)(3).

The list of factors is not exhaustive, and the statute does not require the trial court to find the existence of every factor before concluding that termination is in the best interest of the child. *See Carrington H.*, 483 S.W.3d at 523; *Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). The best interest of a child must be determined from the child's perspective rather than the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). The statute further provides that "[w]hen considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(g)(i)(2).

In this case, the trial court found the following factors applicable: Tennessee Code Annotated sections 36-1-113(i)(A), (B), (C), (D), (E), (H), (I), (L), (M), (O), (P), (Q), (R) and (S). We begin by examining the factors relevant to the Child's emotional needs. *See id.* §§ 36-1-113(i)(A), (B), (D), (E), (H), and (I). The trial court addressed the importance of permanence and stability noting that the Child "does best with a consistent schedule. [The Child] does not easily form attachments and can be wary." The record before the trial court demonstrated that Mother and Stepfather have provided a secure, stable, and loving environment for the Child. The trial court included the finding that Father's inconsistency in communication contributed to the emotional challenges the Child faced. The trial court noted that the Child struggled with transitions, anxiety, and emotional dysregulation when prompted to engage with Father, whom he no longer recognized as a parental figure. The trial court found that the Child formed an attachment with Stepfather "especially as [the Child] has gotten older, in the absence of Father."

We next consider the factors related to whether Father can meet the Child's needs. *See id.* §§ 36-1-113(i)(C), (L), (M), (O), (P), (Q), (R), and (S). The trial court found that Father's inconsistent presence in the Child's life—particularly over the last several years—demonstrated a failure to assume parental responsibilities in a meaningful way. According to the testimony presented at trial, "[the Child] has been solely in the care and custody of his Mother and Stepfather for the entirety of his life. Father has never had an overnight with [the Child] and a significant period of time has passed since [the Child] last saw Father." The trial court emphasized that "Father [had] not demonstrated any sense of urgency in seeking custody of [the Child]." While Mother did not deny that Father has always provided safe care for the Child, the trial court noted that Father's absence from the Child's life left a void in Father's current understanding of the Child's present and specific needs. We agree with the trial court's conclusion that termination of Father's parental rights

- 12 -

was in the Child's best interest.

Father also contends that the trial court erred in failing to consider two factors not enumerated in Tennessee Code Annotated § 36-6-113(i). Specifically, Father asserts that the trial court should have considered his willfulness to parent/visit with the Child and "the emotional well-intentions of those presented to the [c]ourt by Mother and Stepfather." Regarding Father's assertion that we should consider his willfulness within the context of the Child's best interest, we refer to our previous discussion regarding Father's ability to visit and willful failure to do so set forth above in Section 3. We do not deem it necessary to belabor that point any further.

Although not entirely clear, Father's next argument appears to assert that "the emotional well-intentions" of those witnesses who testified for Mother and Stepfather improperly influenced the trial court's decision. To support this argument, Father cites only to testimony of two witnesses that the trial court found to be "abusive" and "combative" and appears to argue that the involvement of these witnesses in the Child's life could have affected the best interest analysis. However, the trial court noted the witness's "deep-seated" bias against Father and gave "limited weight and credibility to [the] testimony."

After considering the relevant statutory factors and assessing their weight, the trial court determined that Mother and Stepfather had proven by clear and convincing evidence that it was in the best interest of the Child for Father's parental rights to be terminated. Upon our own review of the record, we agree with the trial court that the weight of the relevant factors provides clear and convincing evidence that termination is in the Child's best interest. *See Carrington H.*, 483 S.W.3d at 535.

## V.    CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court. Costs are taxed to the Appellant, Zacory S., for which execution may issue if necessary.

s/Valerie L. Smith
VALERIE L. SMITH, JUDGE

- 13 -